HERBERT ENOCH AND NAOMI ENOCH, ET AL.,[1a] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 511–67, 1834–67, 1835–67, 5216–68.    Filed March 15, 1972.

---

[1a] The cases of the following petitioners are consolidated herewith: Herbert Enoch, docket No. 1834–67; R.R.R., Inc., docket No. 1835–67; and Herbert Enoch and Naomi Enoch, docket No. 5216–68.

*Bruce I. Hochman* and *Avram Salkin*, for the petitioners.
*Sheldon M. Sisson*, for the respondent.

FAY, *Judge:* The respondent determined the following deficiencies in, and additions to, the petitioners' income tax for the taxable years 1962, 1963, 1964, and 1965:

| Petitioner | Docket No. | Year | Deficiency | Addition to tax sec. 6653(a) |
|---|---|---|---|---|
| Herbert and Naomi Enoch | 511-67 | 1962 | $29, 976. 13 | |
| | | 1963 | 148, 719. 21 | |
| | | 1964 | 40, 793. 59 | $2, 039. 68 |
| | 5216-68 | 1965 | 103, 759. 00 | 5, 187. 95 |
| R.R.R., Inc | 1835-67 | 1962 | 26, 176. 36 | |
| | | 1963 | 56, 920. 35 | |
| | | 1964 | 20, 098. 71 | |
| Herbert Enoch (transferee of R.R.R.) | 1834-67 | 1962 | 26, 176. 36 | |
| | | 1963 | 56, 920. 35 | |
| | | 1964 | 20, 098. 71 | |

Concessions having been made by both parties, the issues remaining for decision are:

(1) Whether Herbert Enoch received a constructive dividend when his alleged personal and unconditional obligation to acquire all 20 shares of R.R.R., Inc., was satisfied by appropriating the assets of the newly acquired corporation.

(2) Whether Enoch received a constructive dividend when assets of R.R.R. were used to repay an alleged personal loan of $255,000 made to Enoch by the Union Bank of Los Angeles.

(3) Whether R.R.R. improperly claimed ordinary and necessary business expense and interest deductions which were either:

(a) personal obligations of Enoch or A. Pollard Simons; or
(b) capital expenditures; or
(c) served no purposive activity of the corporation.

The specific expenses which the respondent has challenged are:

(a) prepayment penalties made to the Bowery Savings Bank and FHA;
(b) interest payments made on the Union Bank loan;
(c) travel expenses incurred by Simons and his associates;
(d) loan and escrow fees relating to the Lytton Savings & Loan Association loan and the Union Bank escrow; and
(e) incremental interest payments caused by refinancing the original Bowery Savings loan.

(4) Whether the loss incurred by R.R.R. from the sale of its U.S. Treasury bonds is a capital or an ordinary loss.

(5) Whether the amount paid for Enoch's attorney's 20-percent interest in R.R.R. is to be added to Enoch's basis in the R.R.R. stock.

(6) Whether the amount realized by Enoch in the final liquidation of R.R.R. was a repayment of a loan.

(7) Whether a rental loss claimed by Enoch for 1965 should have been disallowed.

(8) Whether the effect of the redemption was to substantially reduce R.R.R.'s earnings and profits account.

(9) Finally, whether part of the underpayment of taxes for the years 1964 and 1965 was due to negligence or intentional disregard of rules and regulations.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioners, Herbert and Naomi Enoch, are husband and wife, and at the time of filing the petitions herein they were residents of Los Angeles, Calif. Their joint Federal income tax returns for the calendar years 1962, 1963, 1964, and 1965 were filed with the district director of internal revenue for the district of Los Angeles.

Petitioner Naomi Enoch is a party herein only by reason of having

filed a joint return with her husband, Herbert Enoch, and the latter will hereinafter be referred to as the petitioner or Enoch.

The petitioner corporation, R.R.R., Inc. (hereinafter referred to as R.R.R.), had its principal place of business in Los Angeles at the time the petitions in these consolidated cases were filed. R.R.R. was a duly organized and existing California corporation which was organized in February 1950. R.R.R.'s fiscal period was the calendar year, and its books and records were maintained on the accrual basis of accounting. Enoch is liable as a transferee for any deficiencies owing by R.R.R.

At all times herein relevant prior to December 3, 1962, there were 20 shares of R.R.R. stock issued and outstanding. A. Pollard Simons (sometimes hereinafter referred to as Simons) of Dallas, Tex., owned 10 shares. Sunrise Mining Corp. (hereinafter referred to as Sunrise), a corporation which was wholly owned by Simons, owned the remaining 10 shares of R.R.R. These 20 shares were held at the Union Bank of Los Angeles (hereinafter referred to as the Union Bank) in escrow No. A–1652–CC–SW pursuant to conditions contained in a permit for issuance of stock issued by the California corporations' commissioner.

At all times herein relevant the principal asset of R.R.R. was an apartment complex called Gloria Homes, which was located on Santa Barbara Avenue in Los Angeles. Gloria Homes consisted of 33 multiple-unit buildings totaling 423 apartments located on approximately 17½ acres of land.

Herbert Enoch was born in Munich, Germany, in 1923. Enoch and his family left Germany in 1939. He worked in New Zealand until 1946 at which time he moved to Minneapolis, Minn., and secured employment as a radio repairman until 1951. In 1951 Enoch moved to Los Angeles and continued working as a radio repairman. Enoch became a real estate salesman in 1956 and has remained in Los Angeles in the real estate business since that date.

Enoch desired to purchase Gloria Homes as early as 1961. He traveled to Dallas in 1961 in furtherance of this desire but nothing materialized from the trip.

However, by 1962 Simons had decided to sell Gloria Homes. Enoch was advised by Dale Wilson, the property manager of Gloria Homes, of Simons' desire to sell. At this time the assets of R.R.R. included:

(a) The Gloria Homes apartments which had a fair market value of_____ $3,500,000 to $4,000,000

(b) An unsecured note receivable from the A. P. Simons Mortgage Corp., in the approximate amount of_____ [1] 532,219
   (Said loan was to be repaid to R.R.R. prior to the completion of any sale transaction involving Gloria Homes.)

[1] This note was a non-interest-bearing loan from R.R.R. to A. P. Simons Mortgage Corp.

(c) Government bonds in the face amount of approximately_____ 90, 000
    (Which were on deposit in lieu of cash in a reserve fund held by the
      Bowery Savings Bank of New York.)
(d) Cash amounting to approximately_____ 25, 000
    (Also on deposit in the reserve fund held by Bowery Savings
      Bank.)
(e) Cash amounting to approximately_____ 42, 000
    (Held by Insurance Funds Mortgage Co.)

The Gloria Homes property, at the time of the contemplated sale, was subject to a first mortgage held by the Bowery Savings Bank of New York (hereinafter referred to as Bowery Savings). The original loan from Bowery Savings was for $3,100,000. This loan was guaranteed by the FHA and was subject to a 4-percent interest rate. The FHA imposed certain restrictions on the borrowing corporation; among these were:

    (a) A requirement that substantial replacement reserves be held in deposit.

    (b) Rental restrictions as to the amount of rent charged.

    (c) Restrictions on distributing assets to shareholders.

In 1962 the remaining balance due on this original $3,100,000 loan was approximately $2,300,000.

Enoch spoke to Simons after hearing of his desire to sell. Simons stated that he desired to realize $1,500,000 for the assets of R.R.R. During the summer of 1962 Enoch and Simons came to an understanding regarding a transaction whereby at the close of such transaction Enoch would own R.R.R., whose sole asset would be Gloria Homes, and Simons would receive $1,500,000 in cash. At this time Enoch had a net worth of $130,000 to $150,000. Simons told Enoch that the approximately $700,000 in assets of the corporation would be available to complete the transaction. Both parties understood that the financing would come from the following sources: Repayment of A. P. Simons Mortgage Corp.'s loan from R.R.R.; return of the reserve balance held by Bowery Savings; return of the amount held by Insurance Funds Mortgage Co.; cash from Enoch; and cash by refinancing Gloria Homes with a new loan that would leave $700,000 in excess after paying the balance owing on the Bowery Savings loan of $2,300,000.

Simons authorized Enoch to refinance Gloria Homes during the escrow period in order to raise the needed $700,000.

The 20 shares of R.R.R. stock were placed in an escrow account and escrow instructions dated August 29, 1962, were prepared by Simons' attorney, Julius A. Leetham. These instructions were then executed by Enoch, Simons, and Sunrise. The escrow agent was the Union Bank of Los Angeles.

These escrow instructions provide in pertinent part:

*A. Pollard Simons and Sunrise Mining Corporation, hereinafter called Seller,* shall cause to be handed to you [Union Bank] 20 shares of common stock of R.R.R., Inc., a California corporation, together with the consent of the Division of Corporations to such transfer and assignment, at the close of escrow.

*Herbert Enoch and/or nominee, hereinafter called Buyer,* shall cause to be handed to you the sum of $1,500,000.00, representing the purchase price of said stock of which $100,000.00 shall be deposited by Buyer upon signing, escrow instructions. You are instructed to deliver said sum totalling $1,500,000.00 * * * at the close of escrow to Seller. * * *

[I]t is recognized that *a new loan is contemplated by Buyer on the assets of R.R.R., Inc.,* and in the event that Buyer does consummate such a loan, Buyer will be solely responsible for the expense of such loan and loan escrow * * * [Emphasis added.]

Further agreements between the parties which were incorporated in the escrow instructions are as follows:

Buyer agrees that in the event this escrow is not consummated through, no fault or refusal of the Seller to complete this transaction, and because of the fault or unjustified refusal on the Buyer's part, the $100,000.00 held in this escrow will be forfeited to the Seller as liquidated damages * * *

*     *     *     *     *     .     *     *

(10) Seller represents that the balance of the existing encumbrance can be paid off by Buyer without penalty for prepayment, or otherwise, but if such is required, *Seller will pay the penalty.* [Emphasis added.]

Immediately after the escrow instructions were signed Enoch began to pursue additional financing with respect to Gloria Homes.

Enoch approached the Union Bank in an attempt to raise the needed funds and it declined to participate in a loan.

Enoch's search for funds was finally successful with the help of the Sun Mortgage Co. of Los Angeles. A financial arrangement was worked out whereby Lytton Savings & Loan Association (hereinafter referred to as Lytton) would loan a substantial part of the money to R.R.R. to finance the transaction.

On or about November 15, 1962, an application and "Request for Consent to Transfer Corporate Shares Held in Escrow and for Additional Authority to Redeem Shares" was filed with the Division of Corporations of the State of California. By order dated November 30, 1962, the California corporations' commissioner consented to the transfer of 1 share of class B common stock of R.R.R. from Simons to Enoch and authorized R.R.R. to reacquire 19 shares of said class B common stock for purposes of cancellation.

On December 3, 1962, Lytton made two loans to R.R.R., bearing interest initially at 5½ percent per annum and increasing to 6 percent per annum. The two loans were in the separate amounts of $1,750,000 and $1,335,000.

The loan proceeds were utilized as follows:

| Item | Loan for $1,750,000 | Loan for $1,335,000 |
|---|---|---|
| Title policy | $3,334.00 | $3,009.00 |
| Loan fees | 115,000.00 | 79,000.00 |
| Escrow fees | 1,249.00 | 859.00 |
| Interest 11/30/62 to 12/1/62 | 267.36 | 203.96 |
| Interest 12/1/62 to 3/1/63 | 24,062.70 | 18,356.40 |
| Miscellaneous costs | 115.80 | 272.61 |
| Payment of principal to Bowery | | 2,285,174.38 |
| Payment of interest to Bowery 11/1/62 to 12/31/62 | | 15,234.50 |
| Prepayment charge to FHA | | 29,097.00 |
| Prepayment penalty | | 25,498.26 |
| Deposit posted by R.R.R. | (5,000.00) | (5,000.00) |
| Impound balance | | (42,233.97) |
| Transferred to Union Bank escrow | | 536,500.00 |
| Total | 139,028.86 | 2,945,971.14 |
| Funds transferred from $1,750,000 loan escrow to $1,335,000 loan escrow | 1,610,971.14 | (1,610,971.14) |
| Total amount borrowed | 1,750,000.00 | 1,335,000.00 |

On or about December 3, 1962, a further sum of $255,000 was borrowed from the Union Bank. This loan appears as an obligation on the books of R.R.R. The loan files of Union Bank contain the following statements regarding this loan:

Mr. Enoch is purchasing the Gloria Homes consisting of two parcels of property improved by 237 apartments and 186 apartments, respectively, located at the southwesterly corner of Santa Barbara Avenue and Rodeo Road, Los Angeles, held by R.R.R., Inc., a California Corporation of which Mr. A. Pollard Simons of Dallas, Texas, has been the principal up until the time of transfer. The apartments are appraised at $3,800,000 to $4,300,000 and are claimed to be in excellent condition. Vacancy factor is stated to be ½ of 1%. Lytton Savings and Loan Association is lending a total of $3,085,000 on the two parcels and part of this (approximately $2,300,000) is being used to take out the present mortgage holder, Bowery Savings Bank of New York. * * *

\*    \*    \*    \*    \*    \*    \*

On top of $20,000 unsecured, *we have approved a loan to Mr. Enoch, endorsed by R.R.R., Inc. of which Mr. Enoch is now President, of $255,000 at 6½% due as follows:* $115,000 due December 31, 1962, $30,000 due February 15, 1963, $30,000 due March 15, 1963, $30,000 due April 15, 1963, and $50,000 due May 15, 1963. [Emphasis added.]

On December 3, 1962, pursuant to the order of the California corporations' commissioner, R.R.R. redeemed 19 shares of its class B stock from Simons and Sunrise for a total price of $1,377,390.49. Concurrently Simons transferred 1 share of said class B stock of R.R.R. to Enoch for a price of $72,494.23. An escrow fee of $250 was paid out of the amount deposited in escrow. All of the funds were paid through the escrow at Union Bank. The source of the funds received by Union Bank for said escrow was as follows:

(a) Net proceeds from Lytton (after all disbursements) _____ { $536,500.00
                                                                22,369.17

(b) Loan from Union Bank (net after deduction of $10,000 in prepaid interest) _____ 245,000.00

| | | |
|---|---|---|
| (c) Deposited by Enoch (after refund of $9,750) _____ | 100,250.00 | |
| (d) Deposit from account of R.R.R. _____ | { 540,269.21 | |
| | { 5,746.34 | |
| Total _____ | [1] 1,450,134.72 | |

[1] The final purchase price reflects adjustments to the initial asking price. These adjustments resulted from prepayment and penalty fees Simons had agreed to absorb. There is also a discrepancy between the amounts paid for the stock and the amounts held in escrow; this is due to escrow fees which were paid out of the amount held in escrow.

On December 5, 1962, Bowery Savings advised Enoch that it had sold $90,000 (basis $89,446.88) worth of U.S. Treasury bonds that R.R.R. had on deposit in lieu of cash in the reserve for replacement fund. The cash realized on this sale was $87,976.08. Lytton's refinancing of the Bowery Savings loan eliminated the FHA restrictions. Consequently, there was no longer a need for a substantial replacement reserve to be held in deposit. The total cash in this reserve fund of $115,255.86 was transferred to Union Bank and applied to the $255,000 loan.

Milton Goldstein, who represented Enoch during the acquisition of R.R.R., asked for, and received, 20 percent of Enoch's interest in the corporation as his fee. As the result of disputes, Enoch acquired Goldstein's interest in the corporation in 1964 by the payment of $39,350 in the form of a cashier's check.

During the year 1962 Simons and his representatives traveled between Dallas and Los Angeles. The cost of this travel, which was deducted by R.R.R. as a business expense, was $1,311.

In 1963 Enoch sought to sell Gloria Homes for $3,550,000. R.R.R. adopted a plan of complete liquidation on July 15, 1963. Form 966 was filed on August 6, 1963. Substantially all of the assets of R.R.R. were sold on March 15, 1964, and shortly thereafter, the assets were distributed to Enoch in complete liquidation of the corporation. The total amount received by Enoch in the liquidation of R.R.R. was $539,490.94. At the time of the sale in liquidation $194,110.40 of the loan fees and costs paid to Lytton remained unamortized. At the time of the liquidation of R.R.R. the basis of the 1 share of class B common stock in the hands of Enoch included the $39,350 payment made to Goldstein. The parties have agreed that the earnings and profits of R.R.R. as of January 1962 were $51,509. A rental loss was claimed by Enoch for 1965 and this also has been disallowed by the respondent.

There were numerous adjustments for the years 1964 and 1965 ranging from the disallowance of over $160,000 of prepaid interest to the reclassification of capital assets as ordinary assets. The Commissioner determined that any underpayments for those years were the result of negligence or intentional disregard of rules and regula-

tions and therefore imposed an addition to the tax under section 6653(a).[2]

OPINION

The starting point from which the resolution of many of the issues in this case will flow is a determination of whether or not Enoch had a personal unconditional obligation to purchase all 20 shares of R.R.R. stock.

The respondent asserts that at the time of the redemption Enoch was personally obligated to purchase all 20 shares of R.R.R. stock and that Enoch appropriated approximately $1,400,000 from the assets of R.R.R. to meet this personal obligation.

The respondent's view of the transaction is that R.R.R. actually distributed approximately $1,400,000 to Enoch which was then used by Enoch to satisfy his obligation to Simons. Relying on sections 301(a), 301(c)(1), and 316(a), the respondent contends that this distribution was made by R.R.R. with respect to its stock and is therefore a distribution includable in Enoch's gross income as a dividend to the extent it is covered by available earnings and profits of the corporation.

In support of his contention the respondent relies on *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947), and *Sullivan* v. *United States*, 363 F. 2d 724 (C.A. 8, 1966), certiorari denied 387 U.S. 905 (1967). In *Wall* the taxpayer owned 50 percent of the outstanding shares of stock in Rosedale Dairy Co. and the remaining shares were owned by Coleman. In 1937 Wall purchased all of Coleman's shares and other assets for a total price of $71,700. Wall paid $6,700 cash and agreed to pay $5,000 annually for 9 years and $20,000 in the 10th year. Wall then transferred the stock purchase from Coleman to two trustees to be held by them as security for the notes. In 1939 Wall transferred to Rosedale his equity interest in this stock held in trust and Rosedale assumed Wall's remaining liability to Coleman. The court in upholding the respondent's contention that the payment by Rosedale on the assumed liability was actually a dividend to Wall stated:

The controlling fact in this situation was that Wall [the buyer] was under an obligation to pay Coleman [the seller] $5,000 in the tax year and that Rosedale [the corporation] paid this indebtedness for Wall [the buyer] out of its surplus. It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. *Douglas* v. *Willcuts*, 296 U.S. 1, 9, 56 S. Ct. 59, 80 L. Ed. 3, 101 A.L.R. 391; *United States* v. *Boston & Maine R. Co.*, 279 U.S. 732, 49 S. Ct. 505, 73 L. Ed. 929; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716, 49

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

S. Ct. 499, 73 L. Ed. 918. The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt. [*Wall v. United States, supra* at 464.]

In *Sullivan* v. *United States, supra,* a case more closely in point, Sullivan, the taxpayer, was charged with a constructive dividend when his personal obligation was discharged by means of a stock redemption. A corporation in which Sullivan owned a controlling interest of 62 percent redeemed the remaining 38 percent of its outstanding shares from the one remaining shareholder. Prior to this redemption Sullivan had unconditionally obligated himself to purchase this block of stock if it was offered to him for sale. This stock was offered to Sullivan but instead of Sullivan accepting the offer the corporation's board of directors authorized the redemption of this stock by the corporation.

The decisions in both cases relied on by the respondent clearly hinged on the court's conclusion that the taxpayers had been relieved of personal, unconditional, primary obligations. The facts in the present case do not support the respondent's contention that Enoch had a similar obligation prior to the redemption.

Enoch's total net worth at the time the negotiations began was approximately $150,000. He knew at this time that the only way this purchase could be effectuated was to utilize the assets of the corporation and "bootstrap" himself into the ownership of the Gloria Homes property. Both Enoch and Simons were well aware of the fact that there would have to be additional financing which would come from an increased loan on the corporation's assets. Simons expressly authorized R.R.R. to refinance the property. Simons told Enoch in conversations held prior to signing the escrow agreement that the corporation had approximately $700,000 in liquid assets which would also be available to complete the transaction. Both Simons and Enoch contemplated a transaction in which Enoch would purchase 1 share of R.R.R. and the corporation would redeem the remaining 19 shares by the use of its own assets plus additional cash raised by refinancing Gloria Homes.

The escrow instructions, which were drawn up by Simons' attorney, contemplated that someone other than Enoch might be the buyer as evidenced by the instruction which defines the term "buyer" as "Herbert Enoch and/or nominee." [3]

---

[3] There is language in some California State court cases which seemingly supports the proposition that "On a sale for cash, when the credit of the buyer is not so important a factor an 'or nominee' offer could *possibly* be construed as an obligation on the part of the named purchaser to either buy or see to it that the property is purchased." (Emphasis added.) *Rivadell, Inc.* v. *Razo,* 215 Cal. App. 2d 614, 625, 30 Cal. Rptr. 622, 628 (1963). However, in light of the facts and circumstances in the present case, we cannot find that either party intended to, or did, impose such an obligation upon Enoch.

Clearly the obligation imposed on Enoch was limited solely to the purchase of the one share of R.R.R. which would give him 100-percent control of the corporation when the simultaneous redemption eliminated the other outstanding shares of voting stock.

In a situation of this sort, the correct view of the transaction is reflected by the reasoning found in *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3, 1958).[4] In that case, on April 30, 1936, the taxpayer acquired an option to purchase 50 percent of the outstanding shares of stock in the Holsey Co. and a further option to purchase within 10 years after the exercise of the first option all the remaining shares for a sum to be agreed upon. On June 28, 1946, the option in favor of the taxpayer was revised. The revision gave the taxpayer the right to purchase the remaining shares at any time for the next 3 years. The new option was in favor of the taxpayer individually and was not assignable by him to anyone other than a corporation in which he owned not less than 50 percent of the voting stock. The taxpayer subsequently assigned the option to Holsey Co. and Holsey Co. redeemed the 50 percent of the shares subject to the option, leaving the taxpayer the sole shareholder of Holsey Co. The Third Circuit found that this redemption did not constitute a constructive dividend to the taxpayer. The court held that:

> But where, as here, the taxpayer was never under any legal obligation to purchase the stock held by the other stockholder * * * having merely an option to purchase which he did not exercise but instead assigned to the Holsey Company, the distribution did not discharge any obligation of his and did not benefit him in any direct sense. [*Holsey* v. *Commissioner*, *supra* at 868.]

In *Holsey* the taxpayer held an option to purchase, while Enoch held no rights at all to the redeemed 19 shares; he is even more barren of any obligation to purchase than the taxpayer in *Holsey*.

When we view the questioned transaction in light of the economic realities we see that as a result of the entire transaction Enoch now owns 100-percent control of a corporation whose sole asset is Gloria Homes. The Gloria Homes apartments are valued at approximately $3,500,000 to $4 million. The property is subject to a mortgage of approximately $3,100,000 and Enoch personally invested approximately another $72,000 in the corporation. Enoch's equity interest at best ranges from approximately $300,000 to $800,000, yet the respondent would have us believe that the transaction resulted in a $1,400,000 distribution to Enoch and a constructive dividend limited only by R.R.R.'s available earnings and profits.

---

[4] *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3, 1958), reversing and remanding 28 T.C. 962 (1957), was acquiesced in by the Commissioner in Rev. Rul. 58-614, 1958-2 C.B. 920, and the reversal was followed by this Court in *Milton F. Priester*, 38 T.C. 316 (1962), a Court-reviewed opinion.

The respondent erred in determining that Enoch received a constructive dividend. Looking at the substance of the instant transaction, Enoch did not receive a constructive dividend from R.R.R. When the purchase of Gloria Homes was finally completed Enoch had not yet realized any additional accretions to gross income. Had Enoch merely made a bona fide purchase of a building valued at $4 million for a total cost of $3,200,000 surely the respondent would not have sought to tax him on the $800,000 as yet unrealized gain resulting from such a purchase. Any economic benefit which Enoch may have derived from this transaction results not from a corporate dividend but rather from Enoch's rather astute purchase of a corporation whose sole asset was a valuable piece of property.

The respondent next contends that R.R.R.'s repayment of the $255,-000 Union Bank loan was a constructive dividend to Enoch in the years of repayment, 1962 and 1963. The respondent alleges that the loan was not made to R.R.R. but rather was a personal loan to Enoch which was merely guaranteed by R.R.R. The respondent again relies on the doctrine previously cited in *Wall* v. *United States*, *supra*, "that the payment of a taxpayer's indebtedness by a third party * * * is income to the taxpayer."

The important determination to be made once again is whether this loan was the obligation of Enoch or R.R.R. It is true that the loan funds were transferred to R.R.R. which in turn used them to meet its obligation to redeem corporate stock, and the bank files do show that the corporation's assets and earning power were to be the source of repayment. However, all of the third-party documents introduced into evidence reflect the personal origin of the Union Bank loan.

The liability ledger of the Union Bank contains a notation at December 3, 1962, that Enoch personally executed the note to the bank. Entries contained in the files of Union Bank indicate this was a personal loan secured by a second trust deed on the Gloria Homes:

*We have approved a loan to Mr. Enoch, endorsed by R.R.R., Inc.*, of which Mr. Enoch is now President, of $255,000 at 6½% * * * [Emphasis added.]
The loan is secured by the one and only share of R.R.R., Inc. "B" common * * *
We also have the guarantee of Mr. Enoch's wife, Naomi. As additional collateral, we have taken a second deed of trust and assignment of rent * * *

Enoch's own letter, dated December 3, 1962, seems to be an acknowledgment that this is a personal loan. He acknowledged that the corporation is guaranteeing the loan and his closing paragraph outlined the steps the bank may take if he personally defaulted on the loan.[5]

---

[5] *"I hereby acknowledge that Union Bank is making a loan in the amount of $255,000.00 secured in part by the pledge of all of the outstanding stock of the corporation known as R.R.R. Inc., of California, and further by the guaranty of said corporation.*

    \*      \*      \*      \*      \*      \*      \*

"In the event that *I default* * * * [Emphasis added.]"

We are convinced that this was a personal loan guaranteed by the corporation. Enoch was not acting as an agent for the corporation. Cf. *Fox* v. *Harrison*, 145 F. 2d 521 (C.A. 7, 1944).

The essence of this part of the transaction was that Enoch borrowed $255,000 from Union Bank. This amount was then promptly advanced as a capital contribution to R.R.R. There is nothing to support Enoch's contention that he made a loan of the funds to R.R.R. rather than a capital contribution. The petitioner has failed to show this Court any facts which would support classifying the entire transaction as a loan from Union Bank to Enoch followed by a subsequent loan from Enoch to R.R.R. with an obligation that R.R.R. repay Enoch.

Respondent is correct in his contention that R.R.R.'s repayment of Enoch's obligation is regarded the same for tax purposes as if R.R.R. made a distribution to Enoch and Enoch utilized these funds to pay his debt. We therefore conclude that to the extent of available earnings and profits, this constructive distribution was a dividend to the petitioner.

The next items in contention are the deductions which R.R.R. claimed either as interest expenses under section 163 or as ordinary and necessary business expenses under section 162.

The respondent correctly disallowed a deduction for the first of these items. This first item was an expense for prepayment penalties paid to Bowery Savings and the FHA. Concurrent with the funding of the new loan from Lytton, the original Bowery Savings loan was paid in full, creating prepayment penalties of $54,595.26. R.R.R. paid these penalties and then improperly claimed the payment as a deduction. These payments did not proximately result from R.R.R.'s business, rather they were the personal obligations of Simons. A corporation cannot pay another's obligation and claim the expense as a business deduction. Such payments are not expenses of the petitioner corporation. "[I]t is the origin of the liability out of which the expense accrues which is material." *Deputy* v. *duPont*, 308 U.S. 488, 494 (1940). Payments unrelated to taxpayer's business are not deductible.

Our determination that this was not R.R.R.'s obligation results from a perusal of the escrow agreement of August 29, 1962. This agreement in pertinent part states: "*A. Pollard Simons and Sunrise Mining Corporation*" *shall be called the "Seller*" and that the "Seller represents that the balance of the existing encumberance can be paid off by Buyer without penalty for prepayment, or otherwise, but if such is required *Seller will pay the penalty*." (Emphasis added.)

Any prepayment charges were clearly the obligation of Simons or Sunrise and not of R.R.R. The authorities cited by the petitioner, *12701 Shaker Boulevard Co.*, 36 T.C. 255 (1961), affd. 312 F. 2d 749 (C.A. 6, 1963), and Rev. Rul. 57-198, 1957-1 C.B. 94, are directed to the situation in which the origin of the liability is not at all in issue. Rather, these authorities concern themselves only with the timing of

the deduction and are therefore of no assistance under the present circumstances.

A second improper deduction claimed by R.R.R. was for interest which R.R.R. paid to Union Bank on the $255,000 loan of December 3, 1962. As stated previously the loan was an obligation of Enoch, not the corporation. Consequently, the interest due on that loan was Enoch's obligation. Here again, R.R.R. may not claim a deduction for paying Enoch's expenses. *Deputy* v. *duPont, supra.*

R.R.R. claimed a further deduction in 1962 of $1,311 as expenses incurred by Simons for travel from Texas to California. The petitioner has the burden to show that a proximate relationship existed between the claimed expenditures and the corporate business. See *United Aniline Co.* v. *Commissioner,* 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court. The petitioner corporation has not convinced this Court that these expenditures were anything other than personal expenditures incurred by Simons in his efforts to sell his interest in R.R.R. Accordingly, we hold that they are not ordinary and necessary business expenditures of R.R.R.

The respondent also denied the petitioner corporation's deduction attributable to expenses for loan fees and escrow charges incurred by R.R.R. in connection with securing the two loans from Lytton.

The respondent has advanced two arguments to support the disallowed deductions. One is directed toward proper timing of the deductions while the other is concerned with the determination of the proper party to claim such.[6] First, the respondent claims that the loan fees which total $194,000 are not proper as interest deductions but should be capitalized over the life of the loan. The respondent is correct in his interpretation of the law. A loan fee is compensation for services rendered in obtaining the loan and is a capital expenditure. In *Julia Stow Lovejoy,* 18 B.T.A. 1179 (1930), the Court was concerned with similar fees and held at page 1182:

> In its essence such a disbursement is not unlike bond discount, prepaid rent, cost of acquiring or disposing of a leasehold or term contract and many other transactions. They should be spread over the definite period of the loan, lease, or contract.

See also *Burnet* v. *S. & L. Bldg. Corp.,* 288 U.S. 406 (1933) ; *and Emil W. Carlson,* 24 B.T.A. 868 (1931).

The petitioner cites authority for the proposition that loan fees are considered additional amounts paid for the use of money and accordingly are deductible as interest in the year of payment by a cash basis taxpayer. See Rev. Rul. 69–188, 1969–1 C.B. 54; Rev. Rul. 69–189,

---

[6] The parties have apparently stipulated as to the timing issue. However, since they have chosen to brief both issues we feel compelled to answer both.

1969–1 C.B. 55; Rev. Rul. 69–290, 1969–1 C.B. 55; Rev. Rul. 69–582, 1969–2 C.B. 29; and *L–R Heat Treating Co.*, 28 T.C. 894 (1957).

We read these authorities to state that where premiums or bonuses are in fact an increment in the cost of borrowed money they shall be treated as interest. The petitioner has not produced any evidence that the loan fees were an additional cost of borrowed money, as opposed to a charge for compensation for services rendered in obtaining the loans.

However, the petitioner is correct in pointing out that should we find these expenditures to be capital expenditures which were the obligations of R.R.R., then the corporation is entitled to deduct the entire unamortized portion of the loan fees upon the 1964 sale of the property. See *S. & L. Building Corporation*, 19 B.T.A. 788, 796 (1930), revd. 60 F.2d 719 (C.A. 2, 1932), revd. 288 U.S. 406 (1933) : "[I]n the case of sale of any of the mortgaged property, the unamortized portion of the mortgage fees relating thereto was written off at the time of such sale." See also *Longview Hilton Hotel Co.*, 9 T.C. 180 (1947).

The respondent's second argument on the fee issue is that the fees were personal obligations of Enoch and therefore the corporation is not entitled to amortize such an expense. In determining whether these amortizable loan fees were the personal obligations of Enoch or obligations of R.R.R. we are again directed to the escrow instructions. The instructions in pertinent part read:

it is recognized that a new loan is contemplated by *Buyer* on the assets of R.R.R., Inc. and in the event that Buyer does consummate such a loan, *Buyer will be solely responsible for the expense of such loan and loan escrow* * * * [Emphasis added.]

We have previously established the fact that "Buyer" as used in this escrow instruction refers to both Enoch and R.R.R. Enoch was committed to buy 1 share and R.R.R. was committed to redeem 19 shares. Therefore the loan expenses should be apportioned accordingly.

These loan and escrow fees are amortizable over the life of the loan; any unamortized amounts are fully deductible in the year the property is sold, and R.R.R. is entitled to deduct 95 percent of such fees.

A fifth item disallowed by the respondent as a deductible item is the excess interest that was generated by the Lytton mortgage. As a result of the redemption transaction the corporation's Gloria Homes property was saddled with a new mortgage of approximately $3,100,000 and a higher rate of interest (4 percent on the Bowery Savings loan versus 5½ percent on the new Lytton Savings loan). The respondent disallowed all of the interest deduction claimed by R.R.R. which was in excess of the amount that would have been paid on the old Bowery Savings loan. He contends that no benefit accrued to R.R.R. by this

refinancing; that in fact R.R.R.'s assets were stripped to help Enoch. accomplish his acquisition. The respondent goes on to argue that more is needed to qualify for an interest deduction under section 163 than the application of the label "interest" to a payment. Relying on *Goldstein* v. *Commissioner*, 364 F. 2d 734 (C.A. 2, 1966), affirming 44 T.C. 284 (1965), certiorari denied 385 U.S. 1005 (1967), the respondent claims that a beneficial purposive activity must be shown in order to justify the additional financing and that such an activity was not shown here. We feel that the respondent's reliance on *Goldstein* is misplaced.

In *Goldstein* the Court denied an interest deduction when the transaction from which the interest expense arose failed to meet a standard of "economic reality." The taxpayer used funds borrowed at 4 percent to purchase U.S. Treasury notes that returned less than 2 percent and held no prospect of appreciation sufficient to counter this interest rate differential. The only economic benefit was in anticipated tax consequences. The Court held that section 163 should not be construed to permit an interest deduction when "it objectively appears that a taxpayer has borrowed funds in order to engage in a transaction that has no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of an interest deduction." *Goldstein* v. *Commissioner, supra* at 741, 742.

The "economic reality" test as formulated in *Goldstein* has in fact been met by the petitioner. There was substance to this loan beyond the petitioner's desire to secure an interest deduction and utility apart from any tax consequences. The respondent, himself, has argued that the primary purpose of the loan was to finance Enoch's acquisition of R.R.R. We read *Goldstein* for the proposition that the interest deduction should not generally be denied once a primary purpose other than tax motivation is established. In fact, the discussion in *Goldstein* as to the congressional purpose behind section 163 reads:

the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds * * * [*Goldstein* v. *Commissioner, supra* at 741.]

Furthermore, we believe that even if the respondent's view of *Goldstein* were correct, the corporation has shown that a purposive business activity was served by the refinancing and therefore even under the respondent's interpretation the interest deductions were proper.

This Court is fully aware that the primary purpose of the new loan was to finance Enoch's acquisition. However, the refinancing caused secondary benefits to accrue to R.R.R. The refinanced loan was FHA insured and carried with it certain FHA restrictions. The lifting of

restrictions, imposing limits on the rents that could be charged by Gloria Homes, and requiring the petitioner corporation to keep large sums tied-up in a reserve replacement and impound balance account, certainly served a beneficial business purpose. Furthermore, the increased ratio of the loan balance to the property value made the Gloria Homes a more salable commodity should R.R.R. decide on such a sale in the future.

We hold that the entire amount of interest paid on the Lytton loan is deductible by the petitioner corporation.

The final deduction claimed by R.R.R. and disallowed by the respondent involves the $1,470 loss which occurred when the petitioner's U.S. Treasury bonds (basis of $89,446.88) were sold for $87,976.08 in order to repay the Union Bank loan.

These bonds were held by Bowery Savings as part of the required FHA reserve fund. The petitioner claims that the bonds were not purchased for investment purposes, rather they were purchased solely to meet FHA reserve requirements. This reserve requirement had to be met if R.R.R. was to obtain an FHA loan and the loan was essential to the conduct of R.R.R.'s business. R.R.R. claims that the bonds were used as an integral part of its business and the loss is an ordinary loss deductible under section 165(a).

The respondent contends that these bonds were capital assets and according to section 165(f)[7] the loss is allowed only to the extent it would be allowed in section 1211(a).[8] Since the petitioner had no gains from the sale of capital assets which could be offset by a capital loss, the respondent claims none of the losses are deductible.

While it is true these securities do not fit into any of the exclusions to the definition of a capital asset as found in section 1221, there is substantial authority that when such property is not acquired for investment purposes and the particular facts of the taxpayer's business show the expenditures for the securities were proper and necessary in the furtherance of such business, the property is not a capital asset. See *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955); *Western Wine & Liquor Co.*, 18 T.C. 1090 (1952); *McMillan Mortgage Co.*, 36 T.C. 924 (1961); and Rev. Rul. 58-40, 1958-1 C.B. 275.

The bonds in question were purchased only to meet the FHA reserve requirements and the FHA loan was necessary in furtherance of

---

[7] SEC. 165. LOSSES.

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

[8] SEC. 1211. LIMITATION ON CAPITAL LOSSES.

(a) CORPORATIONS.—In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges.

R.R.R.'s business. The bonds were sold as soon as the FHA loan was repaid and the restrictions were lifted.

In the case of *Commissioner* v. *Bagley & Sewall Co.*, 221 F. 2d 944 (C.A. 2, 1955), affirming 20 T.C. 983 (1953), the taxpayer was afforded ordinary-loss treatment on the sale of U.S. Government bonds. The taxpayer, a New York corporation, was engaged in the manufacture and sale of papermaking machinery. In 1946 the taxpayer entered into a contract with a corporation representing a foreign country for the sale of various machines. The foreign government required U.S. Government bonds be deposited with a New York financial institution as security for the performance of the contract. The taxpayer purchased bonds to meet the security requirements and sold them at a loss after the contract was completed. The court held that the loss on the sale of these bonds was an ordinary loss incurred in the regular course of the taxpayer's business. In so holding they found that this was not property which must be treated as a capital asset unless specifically exempted by the language of the statute, but rather the nature of such expenditure must be determined by the necessity of the business and the circumstances of the transaction.

Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances. [*Commissioner* v. *Bagley & Sewall Co.*, *supra* at 946, quoting *Commissioner* v. *Heininger*, 320 U.S. 467, 475.]

In light of the foregoing we therefore conclude that the bonds in question were so integrally related to the petitioner's business as to justify treatment of the loss on the sale as an ordinary loss.

The remaining issues concern Herbert Enoch personally. The first of these issues is whether a $39,350 payment from Enoch to Goldstein should be added to Enoch's basis in R.R.R. stock.

Goldstein is an attorney who rendered services to Enoch in connection with Enoch's acquisition of Gloria Homes. In exchange for these services Enoch agreed to give him a 20-percent interest in R.R.R. A dispute later occurred and therefore on April 8, 1964, in exchange for the transfer to Enoch of all of Goldstein's rights and interests in and to the stock of R.R.R., Enoch paid Goldstein $39,350.

The petitioner has offered persuasive evidence that this payment was made solely for the transfer of the 20-percent interest Goldstein held in R.R.R. and as such was an additional cost of this property. According to section 1012 the basis of property is measured by such cost [9] and Enoch's additional cost is properly reflected in an increased basis.

---

[9] SEC. 1012. BASIS OF PROPERTY—COST.

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). * * *

The second of these personal issues concerns a rental loss claimed by Enoch in 1965. In the statutory notice the Commissioner disallowed $22,830.44 of the loss. Prior to trial the petitioner agreed that a portion of the loss, $12,523.73, should have been disallowed. As to the remaining amount, the petitioner has not offered any evidence in rebuttal of the Commissioner's determination. Accordingly, the presumption of correctness of the Commissioner's determination remains as to this item and he therefore must prevail. See *Hoffman* v. *Commissioner*, 298 F. 2d 784, 788 (C.A. 3, 1962), affirming on this issue a Memorandum Opinion of this Court; Rule 32, Tax Court Rules of Practice; *Henry P. Wager*, 52 T.C. 416 (1969).

The respondent and the petitioner also disagree as to the amount Enoch received when he finally sold the Gloria Homes and liquidated R.R.R. in 1964.

The respondent in his statutory notice claimed that Enoch received a total of $558,066.07 in the liquidation. The petitioner reported an amount received of $539,490.94 on his 1964 income tax return.

The difference in these two figures results from the way Enoch treated a particular item amounting to $37,505.77. When Enoch was acquiring Gloria Homes he placed $110,000 in the escrow account. Of this amount Enoch used $72,494.23 for the purchase of his one share of R.R.R. The excess, $37,505.77, Enoch recorded as a loan to R.R.R. The corporation repaid $29,132.63 of said sum during the year 1963 (this included a $9,750 refund from the Union Bank escrow account), and the balance of $8,373.13 was repaid during 1964.

The respondent treated the $37,505.77 item as a contribution to capital and no part of the distribution in liquidation was treated as part of this loan repayment. We hold that there was a proper loan from Enoch to R.R.R. In determining the question of indebtedness or equity interest all the facts must be taken into account. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). This advance had all the attributes of a loan, and the petitioner evidenced an expectation of repayment within a reasonable time. Consequently, the amounts distributed in repayment of this loan were not amounts realized in liquidation, and Enoch received no more than the amount reported in his return for the 1964 liquidation of R.R.R.[10]

We previously found that R.R.R.'s repayment of the Union Bank loan constituted a constructive distribution to Enoch. According to

---

[10] The parties have failed to explain the mathematical discrepancies. The $37,505.77 item was not treated as a loan by the respondent, yet the respondent increased the amount realized in liquidation by a figure of only some $18,575.13 as opposed to treating the entire $37,505.77 as an amount realized in liquidation.

section 316 [11] the amount of that distribution which is taxable as a dividend to Enoch is limited to the available earnings and profits of the corporation at the time of the distribution. The parties have agreed that the earnings and profits of R.R.R. as of January 1, 1962, were $51,509.

There were other distributions made by R.R.R. during the years in question. For purposes of determining dividend consequences, the effect of these distributions on the earnings and profits of R.R.R. must be determined.

Section 312(a) [12] states as a general rule that, except as otherwise provided in this section, distributions of property by a corporation with respect to its stock decrease the earnings and profits of the corporation.

The petitioner contends that there are two distributions which will reduce the earnings and profits under section 312(a).

The first contention of the petitioner is that the sum R.R.R. advanced to Simons Mortgage Corp., which was recorded on R.R.R.'s books as a loan outstanding of $532,219.64, was not a non-interest-bearing loan. The petitioner contends that this was an appropriation of funds which constituted a distribution to A. Pollard Simons and must be considered a constructive dividend. The petitioner asserts that this distribution of over $532,000 reduced all of the available earnings and profits.

It appears in the instant case that Simons intended Simons Mortgage Corp. to repay R.R.R. the loan, and in fact there was a repayment. The petitioner has not convinced us that there was anything other than a bona fide loan. Petitioner is in error in contending that this loan produced dividend consequences and it follows that earnings and profits are not reduced by this transaction. Not all non-

[11] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle; every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

[12] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

(1) the amount of money,

(2) the principal amount of the obligation of such corporation, and

(3) the adjusted basis of the other property, so distributed.

interest-bearing withdrawals of funds give rise to constructive dividends.

The petitioner's second contention is that the redemption of Simons' 19 shares of stock greatly reduced the earnings and profits of R.R.R. While we are in agreement with the petitioner's argument, the exact consequences following therefrom create a further question.

We have held above that the redemption was not a constructive dividend to Enoch, rather it was a complete termination of Simons' interest in R.R.R. and as such is a redemption to which section 302(a) applies.[13] According to section 312(e)[14] so much of the payment in redemption as is not properly chargeable to R.R.R.'s capital account is deemed a distribution out of earnings and profits.

Section 312(e) qualifies the general rule of section 312(a) and provides that in the case of amounts distributed in a redemption to which section 302(a) applies, the part of the distribution properly chargeable to the capital account shall not be treated as a distribution of earnings and profits.

There are two elements necessary to a proper computation under section 312(e). The first is a determination of the amount of the capital account. We now adhere to the rule in *Helvering* v. *Jarvis*, 123 F. 2d 742, 745 (C.A. 4, 1941), affirming 43 B.T.A. 439 (1941), which held that the capital account consists of "the original amount received for its capital stock, comprising both the par value and the paid-in surplus." See also *August Horrmann*, 34 B.T.A. 1178, 1186–1187 (1936); *Arthur C. Stifel*, 29 B.T.A. 1145, 1150 (1934). The amount of the redemption price then chargeable to this capital account is figured as a "portion of the [capital] account equal to the percentage of the corporation's total outstanding shares [20] represented by the number of shares redeemed [19]," in this case a figure of 95 percent. *Bennett* v. *United States*, 427 F. 2d 1202, 1216 (Ct. Cl. 1970), relying on *Helvering* v. *Jarvis*, *supra*.

The effect of the *Jarvis* case is that the charge to capital upon the redemption is such an amount that the ratio between the charge to

---

[13] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

\* \* \* \* \* \* \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

[14] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(e) SPECIAL RULE FOR PARTIAL LIQUIDATIONS AND CERTAIN REDEMPTIONS.—In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.

capital and the capital prior to retirement is the same as the ratio between the number of shares retired and the number of shares outstanding prior to retirement. In other words, a proportionate part of the capital is considered as standing behind each of the shares redeemed. The balance of the distribution is thus charged to earnings and profits even though in excess of the ratable share attributable to the stock redeemed. See Rev. Rul. 70–531, 1970–2 C.B. 76.[15]

In the notice of deficiency for the years 1964 and 1965 the respondent determined that a part of the deficiency was due to negligence or intentional disregard of rules and regulations.

Section 6653(a)[16] provides that if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.

The respondent's determination is prima facie correct and the burden is upon the petitioner to prove this addition is erroneous. See *Ralph Romine*, 25 T.C. 859 (1956); *David Courtney*, 28 T.C. 658 (1957); and *Leroy Jewelry Co.*, 36 T.C. 443 (1961).

There were numerous adjustments for the years 1964 and 1965, ranging from the disallowance of over $160,000 of prepaid interest to the reclassification of capital assets as ordinary assets.

The petitioner's only testimony was that he hired a full-time bookkeeper and an accountant who audited his books and prepared returns. He stated that they had complete control of his records and that he never had any conferences with either of these people prior to the preparation of any returns.

The petitioner cannot avoid his duty to file accurate returns simply by shifting the responsibility to his agents. See *Vern W. Bailey*, 21 T.C. 678 (1954); *American Properties, Inc.*, 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958); and *Leroy Jewelry Co., supra.*

The ultimate responsibility for a correct return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return. See *Elsie SoRelle*, 22 T.C. 459, 489 (1954); *Vern W. Bailey, supra.*

---

[15] We realize that by adhering to our decision in *William D. P. Jarvis*, 43 B.T.A. 439 (1941), affd. 123 F. 2d 742 (C.A. 4, 1941), as to the definition of the "capital account" we have not followed the approach suggested by the Commissioner in Rev. Rul. 70–531, 1970–2 C.B. 76. For a discussion of Rev. Rul. 70–531 see Edelstein, "Revenue Ruling 70–531: Section 312(e) Revisited," 26 Tax L. Rev. 855 (1971). See also McCoy, "Revenue Ruling 70–531: Another View," 26 Tax L. Rev. 864 (1971).

[16] SEC. 6653. FAILURE TO PAY TAX.
(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

There is a lack of testimony by the petitioner as to the nature of the information upon which these erroneous returns were based. Enoch, according to his own testimony, did not take time to consult with or inform the persons who prepared the income tax returns about the various transactions appearing on his returns.

Enoch has the burden of showing this Court that he at least supplied the correct information to his accountant and that the incorrect returns were a result of the accountant's mistakes. We are not convinced that he supplied such information. The petitioner has not met this burden; accordingly, the additions to tax under section 6653(a) are proper.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

RAUM, *J.*, dissenting: I cannot agree with the Court's decision regarding the extent to which the corporation's earnings and profits of R.R.R. were reduced by the redemption of Simons' 19 shares of stock. The majority rejects Rev. Rul. 70–531, 1970–2 C.B. 76, which calls for a contrary result, and it relies instead upon *Helvering* v. *Jarvis*, 123 F. 2d 742 (C.A. 4). In my judgment, *Jarvis* does not require the result reached by the majority.

In holding that a 1934 distribution was to be charged against earnings and profits, thereby reducing the amount of earnings and profits out of which a 1935 distribution could have been made, the court in *Jarvis* stated (123 F. 2d at 745):

> The distribution of earnings and profits was undoubtedly taxed in 1934 to the recipients. It is not to be presumed that Congress intended to treat the 1935 distribution as from the same source and therefore taxable again. * * *

Plainly, what the court was attempting to do in that case was to prevent the same earnings and profits from being taxed twice in the hands of the recipients. No such situation is involved in the present case, whereby earnings and profits properly allocable to stockholders are permanently relieved of any tax when finally distributed to the stockholders.[1] To the contrary, the majority opinion opens a wide loophole. The statute requires no such bizarre result and to the extent

---

[1] Cf. *Foster* v. *United States*, 303 U.S. 118. To be sure, *Foster* involved pre-1913 earnings, and the Court did indeed make specific reference to that fact, but the basic principle involved is substantially the same, and the holding of the majority herein, just as the position unsuccessfully maintained by the taxpayer in *Foster*, would permanently insulate post-1913 corporate earnings and profits from tax in the hands of stockholders when distributed to them.

that Rev. Rul. 70–531 forbids it, that ruling is consistent with the statute and should be followed.

QUEALY, *J.*, agrees with this dissent.

---

QUEALY, *J.*, dissenting: The decision that the redemption by R.R.R. of 19 shares of its stock was not a constructive dividend to Enoch is, in my opinion, wholly irreconcilable in principle with the decision of the U.S. Court of Appeals for the Fifth Circuit in *Casner* v. *Commissioner*, 450 F. 2d 379 (C.A. 5, 1971), reversing in part a Memorandum Opinion of this Court. It must be assumed, therefore, that the majority is refusing to follow the decision of the appellate court in the *Casner* case.

In my opinion, the same rules should apply regardless whether the funds to complete the purchase are derived from a prorata distribution to the existing stockholders or a redemption of a part of the stock. In either instance, the source of the funds is the same, and the amount required of the buyer is correspondingly reduced.