CLARENCE J. O'HERON AND HELEN F. O'HERON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Heron v. Commissioner
Docket No. 13220-79.
United States Tax Court
T.C. Memo 1981-648; 1981 Tax Ct. Memo LEXIS 92; 42 T.C.M. (CCH) 1628; T.C.M. (RIA) 81648; November 5, 1981. *92 Joseph G. Kohler and Kurtis A. Greenley, for the petitioners. Jeffrey D. Lerner, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' income tax for the taxable year 1974 in the amount of $ 47,695, together with an addition to such tax under section 6653(a) of the Internal Revenue Code of 1954, as amended, [1] in the amount of $ 2,425. Many of the issues have been settled by the parties. The remaining issues for decision are: (1) whether petitioner Clarence J. O'Heron's one-half share of the $ 200,000 paid to Ralph Hoffman in 1974 is deductible as an ordinary and necessary business expense and (2) whether petitioners are liable for the addition to tax under section 6653(a) for negligence or intentional disregard of the rules and regulations. FINDINGS OF FACT Some of the facts were stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Clarence J. O'Heron and Helen F. O'Heron timely filed a *93 Federal income tax return for the taxable year 1974. Petitioners resided in Hopkins, Minnesota, both at the time they filed their Federal income tax return for the taxable year 1974 and when they filed their petition in this case. Petitioner Clarence J. O'Heron (hereinafter all references to "petitioner" in the singular refer to Clarence J. O'Heron) became an owner of Midwestern Metal Products Company in Minneapolis, Minnesota, along with Peter J. Platzer (a petitioner in a related case, Docket No. 13219-79, hereinafter referred to as "Platzer") in or about 1943. Midwestern Metal Products Company was a tool shop that manufactured tools, dyes, jigs, and fixtures. In 1947 the name of Midwestern Metal Products Company was changed to Midwestern Machinery Co.Midwestern Machinery Co. was and is engaged in the used machinery business, including the buying, selling, rebuilding, and retooling of machines. During the years 1973 and 1974, Messrs. O'Heron and Platzer each owned 50 percent of Midwestern Machinery Co. in Minneapolis, Minnesota, and directed the activities of the corporation. Messrs. O'Heron and Platzer became acquainted with Mr. Ralph Hoffman (hereinafter "Hoffman") in *94 the course of their used machinery business. Mr. Hoffman was the owner of a business named "Metro Industries, Inc." located in Warren, Michigan. Mr. Hoffman and Metro Industries, Inc. were also engaged in the machinery business. Neither Mr. Hoffman nor Metro Industries, Inc. Were in the real estate business nor licensed as such nor had either been previously so engaged or licensed. A large industrial building with associated real estate was located in Warren, Michigan, in 1972 (the "Mardigian Property"). Mr. Hoffman was aware, in late 1972 or early 1973, that the Mardigian building, together with the equipment in the building, were for sale. He so informed Mr. O'Heron. Shortly thereafter, Mr. Platzer traveled to Warren, Michigan, and inspected the Mardigian plant and equipment. The Mardigian Property was extremely large. It was composed of approximately 15 acres of land and a building which was approximately 150,000 square feet in size. The building had capacity for approximately 18 cranes with individual crane capacities of up to 40 tons. At the time of purchase, however, the building also contained both large machinery and the pits in which the machinery was housed. *95 The greatest part of the building would not be immediately available for rent both because the large machinery could not be moved but rather would have to be dismantled and because the pits were extremely large and numerous and would have to be filled in and capped with cement before the facility was available for use. Mr. Platzer negotiated with Mr. Mardigian for the purchase of the Mrdigian building and equipment. Messrs. O'Heron and Platzer intended to purchase the Mardigian facility in their own names and to cause their company to purchase and sell the machinery. They intended to own and operate the Mardigian Property as a "tax shelter," which combined favorable tax attributes with the potential for significant rental income. Messrs. O'Heron and Platzer both lived in Minnesota, and the business they operated, Midwestern Machinery Co., was also located in Minnesota. In view of the extensive work which would be necessary to make the building suitable for tenants, their contemplated absentee landlord status and the desirability of having someone on location familiar with local contacts in the industry, Messrs. O'Heron and Platzer decided to employ Mr. Hoffman as their manager, *96 provided he would be willing to move his office to the Mardigian Property site. The success of O'Heron and Platzer's contemplated investment in this property was highly contingent on the economy of the Detroit area at the time. They were able to purchase the property at what they considered a very reasonable price because of the depressed state of the auto industry at that time.If successful, they believed that the property would earn each of them an income of approximately $ 5,000 a month, once fully rented. This potential, however, was highly speculative. Mr. Platzer met with Mr. Hoffman in January of 1973, at about the same time as his first inspection of the Mardigian Property. Mr. Platzer indicated to Mr. Hoffman that he and Mr. O'Heron would be interested in purchasing the Mardigian Property and that they would want Mr. Hoffman to agree to move in and manage the property. Messrs. O'Heron and Platzer would pay Hoffman one-third of the profit from the Mardigian Property. Messrs. O'Heron, Platzer and Hoffman subsequently made a verbal agreement to this effect, a business procedure customary in the machinery business that all were familiar with. O'Heron and Platzer *97 intended to purchase the Mardigian Property in their individual names. The owner of the Mardigian Property, however, insisted that the Mardigian Property, as well as the equipment, be sold in one transaction as a package. The Mardigian Property, including the equipment, was therefore initially transferred to Midwestern Machinery Co., and immediately thereafter all of the Mardigian Property except for the equipment was spun out to O'Heron and Platzer individually. The title to the Mardigian building and the associated real estate was transferred to Messrs. O'Heron and Platzer and their respective wives by Warranty Deed dated February 23, 1973. Mr. Hoffman was not involved in the purchase or financing of the Mardigian Property. He did not sign any notes or mortgages, guarantee any loans, post any form of security nor acquire any form of legal title to the Property. Mr. Hoffman moved into the building and began preparing it for rental use soon after Messrs. O'Heron and Platzer purchased the Mardigian Property. The property was advertised for lease and tenants were secured as portions of the building became available for use. At no time prior to contact by Mr. Hofley, who *98 subsequently purchased the Mardigian Property, did they list the property for sale with any real estate agent or otherwise endeavor to sell it.They advertised the property as available on the basis of an annual lease but were also negotiating with at least one tenant for a five-year lease. Mr. Hoffman in his role as manager, analyzed the needs for repair or modification of the building and arranged for and supervised all repairs or modifications. He inspected the large heating facility in order to update the boiler equipment, combustion controls and similar parts of the system. He obtained bids and arranged for work on the gas-fired boilers. Mr. Hoffman's responsibilities also included maintaining regular security arrangements, overseeing and paying utility expenses, replacing windows, cleaning up the yards, and cutting the grass. He was responsible for working with potential tenants to determine what modifications to the facility would be necessary in order to accommodate their particular needs. Mr. Hoffman talked to Messrs. O'Heron and Platzer to find out what they would be charging per square foot for the rental. He then dealt directly with the tenants. Mr. Hoffman obtained *99 all of the tenants that moved into the building. Mr. Hoffman devoted nearly all of his time to the Mardigian building in 1974, approximately half of which was directly related to his building management responsibilities and half of which was related to disposing of the equipment. The management agreement securing Mr. Hoffman's services as building manager for the Mardigian Property was a contingent compensation agreement. His compensation was tied to the profits of the project and was therefore deferred until such time as the project resulted in a return of profit. The property in fact did not generate a profit in 1973 or early 1974. At the time Messrs. O'Heron and Platzer purchased the Mardigian Property in 1973, the economic situation in Detroit was moderately depressed but improved thereafter. In early 1974, Mr. Hofley, President of Hofley Manufacturing Co. which was one of the tenants renting space in the building, came to Mr. Hoffman to discuss purchasing the building. Mr. Hoffman referred Mr. Hofley to Mr. O'Heron. Mr. Hofley subsequently negotiated with Mr. O'Heron and offered O'Heron and Platzer $ 1,450,000 for the Mardigian Property. This offer was "too good to *100 refuse" and was accepted by Messrs. O'Heron and Platzer. Mr. Hoffman was entitled to one-third of any profits from the property under the management agreement. Accordingly, his share of the profit from the sale of the building was approximately $ 249,000. This compensation was to be paid over a 15-year period in accordance with the terms of the land contract. Mr. Hoffman, however, wanted to obtain his total payment immediately.Accordingly, O'Heron and Platzer discounted Mr. Hoffman's share to a present value of $ 200,000 and paid him in two installments of $ 100,000 each. Mr. Hoffman caused these payments to be made to his company, Metro Industries, Inc. Mr. O'Heron's Federal income tax return for the taxable year 1974 was prepared and filed by the accounting firm of Mr. Leo Breitman, a certified public accountant. Mr. O'Heron's share of the payments to Mr. Hoffman in accordance with the management agreement was reported on that return as an expense of operating the Mardigian Property. When Mr. O'Heron's 1974 Federal income tax return was audited by the Commissioner, the revenue agent determined that a legal expense connected with the sale of the Mardigian Building should *101 have been reported as an expense of sale rather than deducted as a business expense as reported on the return. Mr. O'Heron provided the certified public accountant who prepared his return sufficient information to report this item correctly but an individual in the office of the certified public accountant prepared the return incorrectly. Mr. O'Heron agreed with the disallowance of this item as a deduction. The revenue agent also disallowed various business expenses, comprised of deductions for parking, telephone expense, and postage, on the basis of insufficient substantiation. Although Mr. O'Heron felt that these were appropriate business expenses, he chose not to contest the issue and agreed to the additional tax.The revenue agent also disallowed $ 309 relating to expenses of Mrs. O'Heron. Mr. O'Heron believed that these expenses were properly deductible because his wife incurred them in entertaining various business customers. He concluded, however, that it was a nominal amount and agreed to pay the additional tax. ULTIMATE FINDING OF FACT Mr. Ralph Hoffman was retained by Messrs. O'Heron and Platzer to act as manager of the Mardigian Property under a management agreement *102 in which Mr. Hoffman's compensation as manager would be one-third of any profits therefrom. OPINION The first issue concerns the Federal income tax treatment of payments in the amount of $ 200,000 made by Petitioner Clarence J. O'Heron and Peter J. Platzer to Ralph Hoffman in 1974. Petitioner maintains that these sums represent the ordinary and necessary business expense of Mr. Hoffman's management services in view of the contingent nature of his compensation. Respondent argues that Mr. Hoffman was a joint venturer with O'Heron and Platzer and that the $ 200,000 payment was for the purchase of Hoffman's interest, a capital expense. In the alternative, the respondent argues that the $ 200,000 payment represents a finder's fee that is properly treated as a cost of the sale and therefore a capital expense. Respondent also presents several untimely arguments. Respondent suggests for the first time on brief after trial that the payments to Mr. Hoffman were for his services in preparing the Property for rental use and were therefore capital in nature. We find that at least some of Mr. Hoffman's activities were not capital in nature. This late argument deprives the petitioner of *103 the opportunity to put on proof as to the proper allocation, if any, between amounts paid for services of a capital nature and amounts paid for services that are properly deductible as an ordinary and necessary business expense. Accordingly, we will not consider this theory. Fox Chevrolet v. Commissioner, 76 T.C. 708, 733-736 (1981). Respondent also presents two other untimely arguments. Respondent maintains that the oral management agreement is void under Michigan law and that even if the $ 200,000 payment is considered compensation it must also be reasonable. These late arguments are equally prejudicial and will not be considered. Whether Mr. Hoffman was an employee of or joint venturer with O'Heron and Platzer is a factual determination. We find Messrs. O'Heron, Platzer and Hoffman to be credible witnesses. We believe them to be honest, forthright and candid. The testimony of Mr. Reagan, Mr. Hoffman's attorney, weighs especially strong in our consideration. Mr. Reagan's testimony is persuasive because he is an attorney and, although related to Mr. Hoffman at least as his attorney, is an independent witness. Mr. Reagan was not a principal in the relationship *104 between O'Heron, Platzer and Hoffman, but he was in a position to know the nature of their agreement and was present during several of the key discussions. Mr. Reagan was an excellent witness who convinced us through his testimony that the relationship was indeed one of employment and not one in which Mr. Hoffman was a joint venturer or in which he received a finder's fee. None of petitioner's evidence indicates that payments were anything other than a management fee. Petitioners' evidence was sufficient to shift the burden of going forward to respondent to present controverting evidence. Respondent offered no evidence. The arguments of respondent appear to be based upon speculation and not upon evidence. The fact that Mr. Hoffman's compensation is measured by profits does not create suspicion on our part but rather appears as a very prudent motivational tool. The fact that the profits in question included profits on sale is similarly reasonable. A manager under such a contingent agreement would be foolish to let the fruits of his efforts be sold out from under him. This management agreement is an arm's-length transaction between unrelated parties. The respondent has shown *105 us no reason to look behind the clear and uncontroverted terms of their agreement. The agreement of the parties must stand even if it is unusual or unwise and should not be reinterpreted merely because the Commissioner may collect more revenues under another theory. Petitioners have sustained their burden of proof. We hold that petitioners' one-half share of the $ 200,000 paid to Ralph Hoffman in 1974 is deductible as an ordinary and necessary business expense. We must now consider whether an addition to tax under Section 6653(a) is appropriate. Section 6653(a) provides that if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations, an addition to tax in the amount of 5 percent of the underpayment will be imposed. Respondent's determination of the negligence penalty is presumptively correct and petitioners have the burden of proving such determination to be erroneous. Courtney v. Commissioner, 28 T.C. 658 (1957). We have found that petitioner reported his share of the $ 200,000 payments to Mr. Hoffman correctly on his 1974 Federal income tax return. The remaining proposed adjustments of the respondent on *106 which the addition to tax must be based are much less significant. Petitioners' return mischaracterized the payment of attorney's fees on the purchase of the Mardigian Property as a deductible expense rather than as a capital expenditure. Respondent, however, permitted his own witness, the revenue agent who audited Mr. O'Heron's return, to introduce hearsay evidence that this mischaracterization was the result of a mistake in the office of Mr. O'Heron's certified public accountant.The petitioner cannot avoid his duty to file accurate returns simply by shifting the responsibility to his agents. Enoch v. Commissioner, 57 T.C. 781 (1972). We explained in the Enoch case that the petitioner has the burden of showing the court that he has supplied the correct information to his accountant and that the incorrect return was a result of the accountant's mistakes. Enoch, supra, at 803. We find that the petitioners have met this burden and that the error was not the result of petitioners' negligence or intentional disregard of the rules and regulations. The remaining adjustments on which the addition to tax may be based are the disallowance of *107 various business expenses. These were not disallowed for failure of the petitioners to keep adequate records, but rather on the basis of lack of substantiation in the case of various expenses which include postage and parking expenses and lack of business purpose regarding the $ 309 of Mrs. O'Heron's expenses. We hold for petitioners. We find that the petitioners have met their burden of proof on the basis of the record as a whole and that these adjustments do not result from either negligence or intentional disregard of the rules and regulations on the part of the petitioners. In so doing we do not lay down any general rule as to what constitutes negligence but rather find that the petitioners have met their burden of proof on this record. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩