THERON G. RANDOLPH AND JANET M. RANDOLPH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2964–74. Filed December 16, 1976.

*Don S. Harnack* and *George W. Benson,* for the petitioners. *Harmon B. Dow,* for the respondent.

WILES, *Judge:* Respondent determined a deficiency of $1,480 in petitioners' income taxes for 1971. The only issue to be decided is whether petitioners may deduct as a medical expense the amount by which the cost of specially grown, packaged, and prepared foods exceeds the cost of ordinary foods.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Theron G. and Janet M. Randolph, husband and wife, resided in Chicago, Ill., during 1971, and at the time they filed a petition with this Court. They timely filed a joint return for 1971 with the Internal Revenue Service Center, Kansas City, Mo.

Theron G. Randolph is a medical doctor licensed to practice in Illinois. He graduated from the University of Michigan

Medical School in 1933, interned at the University Hospital, Ann Arbor, Mich., from 1933 to 1934, did his residency work in internal medicine at the University of Michigan Medical School from 1934 to 1935, instructed at the University of Michigan Medical School from 1935 to 1937, was a research fellow in allergy at the Massachusetts General Hospital and Harvard Medical School from 1937 to 1939, and head of the Allergy Clinic at the University of Michigan Medical School from 1942 to 1944. From 1944 to present, Dr. Randolph has been in private practice specializing as a clinical ecologist, commonly referred to as an allergist. In addition to his private practice, from 1945 until 1950, Dr. Randolph was on the staff of Northwestern University Medical School as an instructor and an associate in internal medicine with particular emphasis in allergy. As an allergist, Dr. Randolph specializes in treating individuals who are highly allergic to chemical contaminants found in the modern environment.

Janet Randolph[1] has had less than ideal health for most of her life. While in high school she suffered from asthma and arthritis, conditions that required her to move to Arizona so she could live in a warm, dry climate. During the same period her neck became severely swollen and disfigured. She was improperly diagnosed as suffering from cancer of the throat and therefore underwent a series of radium treatments. These treatments have left her throat permanently disfigured. Despite constant care and attention, Mrs. Randolph's condition continued to decline to such a degree that she weighed only 85 pounds, and physicians treating her were unsure what was necessary to keep her alive.

In 1953, while in an extremely debilitated condition, Mrs. Randolph was brought by her brother, a medical doctor, to Dr. Randolph for diagnosis and treatment. According to medical records maintained at that time, she suffered from nausea, bronchitis, headaches, colds, vomiting, severe difficulty in breathing and swallowing, swelling of the throat, and hives that at times grotesquely involved her face. During critical periods Mrs. Randolph's allergic reactions caused her to lapse into unconsciousness and on occasion she required hospitalization. Over a period of time and through various tests, Dr. Randolph determined that many of Janet Randolph's medical

---

[1] Janet Randolph, formerly Janet Walker, was married to Dr. Randolph in 1954.

problems could be traced to an extreme sensitivity to environmental contaminants including petrochemicals, herbicides, insecticides, and phenolic compounds. He therefore required her to limit her diet to uncontaminated food.

Through rigorous control of her environment and by limiting her diet to organic foods, Mrs. Randolph's health has been maintained and indeed improved. Nevertheless, accidental exposure to insecticides, herbicides, natural gas, exhaust from internal combustion engines, and food stored in phenol-lined tin cans has precipitated severe allergic reactions. When she inhales or ingests contaminants, Mrs. Randolph exhibits mental confusion, crossed eyes, and difficulty in walking. Her neck becomes swollen and she suffers from severe respiratory distress. Within minutes, she slumps into an unconscious stupor. Since 1953, Mrs. Randolph has lapsed into an unconscious state several hundred times, and has frequently required hospitalization.

Dr. Randolph has a similar, although less acute, allergic reaction to chemically contaminated foods. When he eats chemically treated food Dr. Randolph exhibits loginess and malaise, and suffers headaches, nausea, and anorexia.

Although Dr. Randolph has been primarily responsible for the care of their allergies, both his diagnosis and treatment have been corroborated by three unrelated physicians familiar with the Randolphs' case histories. Dr. Ralph C. Roberts, the Randolphs' personal physician for over 20 years, has observed Dr. Randolph's symptoms of loginess, headache, malaise, and general inability to concentrate that result from exposure to chemically contaminated foods. Dr. Roberts has also seen Mrs. Randolph in severe respiratory distress when she required emergency hospitalization. To avoid these allergic reactions, Dr. Roberts has recommended that the Randolphs limit their diet to foods that have not been chemically treated or canned in phenol-lined tins.

Two certified allergists familiar with the Randolphs' case histories, Dr. Robert W. Boxer and Dr. Joseph Interlandi, also agree with Dr. Randolph's diagnosis and treatment of the Randolphs' allergies. Dr. Boxer, an allergy specialist since 1956, described Mrs. Randolph as exquisitely sensitive to a variety of chemicals including hydrocarbons and petrochemicals. Dr. Boxer believes that the appropriate treatment for

Mrs. Randolph is to control her exposure to chemical contaminants by avoiding chemically contaminated foods. Similarly, Dr. Interlandi noted that if Dr. or Mrs. Randolph ingested chemically contaminated foods they would suffer prolonged disability due to physical illness. Dr. Interlandi noted that the only effective treatment for Dr. and Mrs. Randolphs' condition is total avoidance of the chemical contaminants.

In an effort to avoid environmental contaminants to which they are especially allergic, petitioners have moved from areas in which herbicides and insecticides are commonly used. Of specific importance to this case, the Randolphs avoid eating foods that have been artificially ripened, stored, sweetened, colored, and preserved, or foods that have been canned in phenol-lined tins, and eat only so-called "organic" foods: foods that have not been treated with herbicides or insecticides.

In order to assure their foods are uncontaminated, petitioners shop at various health food stores that sell specially grown, transported, packaged, and marketed foods. The special handling of foods found in health food stores results in a retail cost that is higher than the cost of similar nonorganically grown and prepared foods. A comparison of retail food prices supplied by the United States Department of Labor, Bureau of Statistics, with sales receipts obtained from the health food store where petitioners buy 80 percent of their food, indicates that organically grown food is approximately twice as expensive as similar, chemically treated food. During 1971, petitioners purchased organic food costing $6,156.91 from various health food stores. On their 1971 income tax return, petitioners deducted $3,086 as an itemized medical expense. The itemized deduction was described on their return as "special foods needed due to spray sensitivity on foods causing violent sickness. Special foods cost approx. twice the price of normal foods." In his notice of deficiency, respondent disallowed petitioners' deduction noting, "the deduction of $3,086 which you claimed as a medical expense consisting of the cost of special foods is a non-deductible personal expenditure."

OPINION

The question we must resolve is whether petitioners are entitled to a medical expense deduction under section 213[2] for a portion of the cost of chemically uncontaminated food purchased in 1971. Petitioners contend they suffer from chemical allergies that require them to limit their diets to foods untreated by pesticides and herbicides. These foods, as a rule, are more expensive than similar, chemically treated foods. Petitioners argue that the additional cost of uncontaminated foods should be a deductible medical expense.

In contrast, respondent argues that all expenses incurred in purchasing chemically uncontaminated food are nondeductible personal expenses.

Upon considering extensive medical history and testimony, we conclude petitioners suffer from chemical allergies, the treatment and mitigation of which require petitioners to restrict their diets to chemically uncontaminated foods. Based on receipts and other available information, we further conclude that chemically uncontaminated food is more expensive than similar, chemically treated food. Finally, considering all relevant legal arguments, including those made by respondent and petitioners, we conclude that under the unusual facts of this case the additional expense petitioners incurred in restricting their diets to chemically uncontaminated food is an expense incurred for medical care deductible to the extent allowable under section 213.

Petitioners Theron and Janet Randolph are allergic to chemical compounds found in herbicides, pesticides, various synthetics, hydrocarbons, and petrochemicals. When exposed to chemical compounds found in herbicides and pesticides, Dr. Randolph suffers headaches, nausea, anorexia, as well as

---

[2] Unless otherwise noted, statutory references are to the Internal Revenue Code of 1954.

Sec. 213(a) reads:

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts, not compensated for by insurance or otherwise—

(1) the amount by which the amount of the expenses paid during the taxable year * * * for medical care of the taxpayer, his spouse, and dependents * * * exceeds 3 percent of the adjusted gross income * * *

Sec. 213(e)(1)(A) defines "medical care" as "amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body."

exhibiting a state of loginess and malaise accompanied with a general inability to concentrate. These symptoms are then followed by prolonged disability due to physical illness.

Mrs. Randolph's allergic reactions to chemical contaminants are more severe than her husband's. When she ingests or inhales chemical contaminants she exhibits mental confusion, her eyes cross, she has trouble walking, and she suffers severe respiratory distress. As a result of accidental exposure, Mrs. Randolph has required hospitalization on various occasions, and has lapsed into an unconscious stupor several hundred times in the past 20 years.

By carefully controlling their environment and by restricting their diets to uncontaminated organic foods, the Randolphs have substantially reduced their allergic reactions, and, especially in Mrs. Randolph's case, have dramatically improved their health. Indeed, unrebutted testimony presented at trial by three independent, unrelated physicians indicates that this is the only method of effectively treating chemical allergies.

The parties stipulate that during 1971, petitioners spent $6,156.91 for food at various health food stores. Petitioners contend that similar but contaminated food purchased at local grocery stores would have cost $3,079.45, and therefore the added expense of purchasing uncontaminated foods was $3,077.46.[3]

After comparing prices of food at the health food store from which petitioners made most of their purchases with average prices of similar food in the Chicago area as determined by the United States Department of Labor, Bureau of Statistics, we agree that petitioners incurred additional costs of $3,077.46 in limiting their diets to chemically uncontaminated foods. Obviously we have been forced to make estimates of additional costs incurred by petitioners as a result of the

---

[3] On their income tax return petitioners noted that they spent $6,171.10 on "special foods," and claimed that one-half of this amount, $3,086, was a medical care expense. Petitioners now stipulate they spent $6,156.91 for food at various health food stores. On brief, petitioners note that similar contaminated food would have cost $3,079.45. Apparently believing that $3,079.45 is one-half of $6,156.91, petitioners allege their records substantiate medical care expenses of $3,079.45. Since petitioners stipulate they spent $6,156.91 at health food stores, and since they contend similar contaminated food would have cost $3,079.45, petitioners can only argue that $3,077.46 was the added expense of purchasing uncontaminated food.

Randolphs' specially prescribed diet. This fact, however, does not per se require a finding that no additional costs were incurred. Indeed, as noted in *Cohan v. Commissioner,* 39 F.2d 540, 543–544 (2d Cir. 1930), "Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. * * * It is not fatal that the result will inevitably be speculative; many important decisions must be such." Petitioners have supplied us with the total amount spent for organic food. They have also provided us with monthly food prices from the store from which they purchased over 80 percent of their food. Similarly, they have provided us with monthly statistics showing the average cost of various foods in the Chicago area. This material has provided us with an adequate basis for determining the additional cost of organic food.

Since petitioners suffered from chemical allergies that could be mitigated only by restricting their diet to chemically uncontaminated foods, we believe the additional expenses incurred in adhering to their medically required diet are deductible medical expenses. As this Court noted in *Edward A. Havey,* 12 T.C. 409, 412 (1949):

To be deductible as medical expense, there must be a direct or proximate relation between the expense and the diagnosis, cure, mitigation, treatment, or prevention of disease or the expense must have been incurred for the purpose of affecting some structure or function of the body.

In determining allowability, many factors must be considered. Consideration should be accorded the motive or purpose of the taxpayer, but such factor is not alone determinative. To accord it conclusive weight would make nugatory the prohibition against allowing personal, living, or family expenses. Thus also it is important to inquire as to the origin of the expense. Was it incurred at the direction or suggestion of a physician; did the treatment bear directly on the physical condition in question; did the treatment bear such a direct or proximate therapeutic relation to the bodily condition as to justify a reasonable belief the same would be efficacious; was the treatment so proximate in time to the onset or recurrence of the disease or condition as to make one the true occasion of the other, thus eliminating expense incurred for general, as contrasted with some specific, physical improvement?

We believe that the additional expenses incurred in purchasing the Randolphs' organic food meet this definition of a deductible medical expense.

The case most closely related to the facts before us is *Leo R. Cohn,* 38 T.C. 387 (1962). In *Cohn* taxpayer suffered from high blood pressure and heart failure. Because of his heart condition, taxpayer was required to maintain a salt-free diet. In order to adhere to his diet, taxpayer ate at restaurants that prepared salt-free meals for him. The restaurants charged additional amounts for preparing meals without salt. In allowing taxpayer's deduction of this additional charge, we noted at page 391:

Here the item sought to be deducted is not the cost of the food which was taken to satisfy Leo's ordinary nutritional needs but rather the additional charge for special preparation of salt-free food. This charge is in no sense a personal living or family expense—it is a sum paid for the mitigation, cure, or prevention of a disease. Therefore, the petitioners are entitled to deduct as a medical expense * * * the additional charges made by restaurants to prepare salt-free meals for Leo.

Similarly, we believe petitioners are entitled to deduct the *additional* charge incurred in obtaining their specially grown, packaged, and transported organic foods. As in *Cohn,* petitioners suffer from a medical condition that must be treated by a special diet. In *Cohn,* additional expenses were incurred to obtain specially prepared foods. In the case before us, petitioners incurred additional expenses to obtain specially grown and handled foods. Petitioners did not deduct the established cost of similar chemically treated food. Rather, as in *Cohn,* petitioners deducted only the added costs attributable to the special handling of the food. For the added expense incurred in *Cohn,* taxpayer obtained salt-free food; for their added expense, petitioners obtained chemical-free food. In both *Cohn* and the case before us, the sole benefit received for the added expense was the relief from medical infirmities.

Respondent contends that all amounts spent by petitioners for organic food were personal, nondeductible expenses under section 262. In support of this contention, respondent relies primarily on *J. Willard Harris,* 46 T.C. 672 (1966), and *Newman v. United States,* an unreported case (W.D.Ark. 1968, 23 AFTR 2d 69–584, 68–1 USTC par. 9411).[4] In both of these

----

[4] Respondent also relies on *Doris V. Clark,* 29 T.C. 196 (1957), in which this Court disallowed a deduction of amounts spent for baby food for taxpayer's dependent mother. In *Clark* there was no showing that the diet of baby food was medically prescribed or that it was related to the treatment, mitigation, or cure of any disease.

cases taxpayers were medically required to limit their intake of sugar. Taxpayers deducted, in their entirety, the cost of special, artificially sweetened foods. In neither case did the taxpayers argue that the foods were more expensive than their nondietetic counterparts, nor did they argue that any additional cost incurred in purchasing these foods was a deductible medical expense. Rather, taxpayers argued that the foods were medically required *supplements* to an ordinary diet, and therefore deductible in their entirety. The courts found that the foods were not supplements to an ordinary diet, and therefore were not, as argued by taxpayers, deductible medical expenses.

Unlike the taxpayers in *Newman* and *Harris*, petitioners do not contend that the amount spent for organic food was for dietary supplements, and hence deductible in its entirety. Rather, petitioners deducted only the *added cost* attributed to special handling required to grow, package, and market food in a chemically free environment. Had there been no added charge for special handling, petitioners would not be allowed a medical expense deduction. Indeed, petitioners, by deducting only the added cost attributable to special handling, recognize that no medical care deduction was allowed for what has been established as the equivalent food prices for similar chemically treated food.

Petitioners have provided us with a wealth of evidence detailing their medical histories and expenditures. In doing so, they have more than met their burden of proof—a burden which is not easy to meet in this type of case, where, under slightly different facts, petitioners may have merely satisfied personal, nonmedical needs. Therefore, we conclude that, based upon the facts and record of this case, petitioners incurred expenses for medical care of $3,077.46 that are deductible to the extent provided by section 213.[5]

---

As such, *Clark* is clearly distinguishable.

[5] We note that this opinion is consistent with several of respondent's rulings. Rev. Rul. 76-80, 1976-10 I.R.B. 8, states:

"Where an item purchased in a special form primarily for the alleviation of a physical defect is one that is ordinarily used for personal, living, and family purposes, the excess of the cost of the special form over the normal cost of the item is an expense for medical care * * *."

Because petitioners reported larger medical care expenses than we have found,

*Decision will be entered under Rule 155.*

Reviewed by the Court.