GARNETT W. NEIL and DOROTHY M. NEIL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Neil v. Commissioner
Docket Nos. 16436-81, 29287-81.
United States Tax Court
T.C. Memo 1982-562; 1982 Tax Ct. Memo LEXIS 196; 44 T.C.M. (CCH) 1237; T.C.M. (RIA) 82562; September 23, 1982. Garnett W. and Dorothy M. Neil, pro se. Kevin M. Bagley, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Additions to Tax
Calendar
Deficiency in
I.R.C. 1954
Year
Income Tax
Section 6653(a)
1977
$6,928
$346.40
1978
3,200
160.00
1979 [1]
4,479
224.00
*197 Some of the issues raised by the pleadings have been disposed of by the parties leaving for our decision the following: (1) whether petitioners are entitled to deduct the cost of a concrete block wall built on petitioners' rental property or are required to capitalize the cost of the wall and depreciate it and, if it is to be depreciated, over what number of years is it properly depreciable; (2) whether petitioners are entitled to include in their medical expense deduction the cost of vitamins which were prescribed for them by a physician; (3) whether petitioners are entitled to deductions they claimed as contributions to the Universal Life Church, Inc., in the amount of $19,328 in 1977 and $11,093 in 1978; (4) whether petitioners are entitled to deduct in 1978 either as a tax or a contribution an amount which they estimated was the extra cost of items of food which they contend sold at a premium because of being approved by the Council of Rabbis; and (5) whether petitioners are liable for the addition to tax under section 6653(a)[2] for each of the years 1977 and 1978. *198 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in San Diego, California, at the time of the filing of the petitions in this case, filed joint Federal income tax returns for the calendar years 1977 and 1978. During 1977 and 1978, petitioners owned a piece of rental property. They had owned the property for some years and used it as rental property for approximately 20 years prior to the years here in issue. There had been a wooden wall on the property that kept it from eroding. In 1977, the wall was in total disrepair and petitioners commenced the building of a concrete block wall to replace the wooden wall. They paid a total of $2,177 for the wall of which $1,150 was paid in 1977 and $1,027 in 1978. The wall was completed in January 1978. The house on the rental property on which the wall was built was shown on the depreciation schedule of petitioners' 1977 tax return as having been acquired on May 21, 1958, at a cost of $6,500, and depreciation was taken on a straight-line basis and a useful life of 30 years. The wooden fence which had previously been on the property was made from redwood. *199 It had been placed on the property in 1958 and had remained in good shape for approximately 10 years. After that, it had been in such poor condition that the property had begun to erode from the heavy rains that occurred at certain times of the year. The property on which the fence was placed was located about one block from an earthquake fault line and there was earthquake activity, although the quakes were minor, affecting the property from time to time. This earthquake activity had a tendency to break up or crack a concrete block fence. Also, there is a considerable amount of flooding in the area in which the property is located and the flooding tends to settle the foundation of a concrete block wall and make it more susceptible to cracking at the time of earthquakes. During the years here in issue, Mr. Neil suffered from a heart condition and Mrs. Neil suffered from arterial sclerosis. During the years here in issue and for some years prior thereto, Mr. and Mrs. Neil consulted regularly with H. Rudolph Alsleben, M.D. Dr. Alsleben was interested in the Alsleben-Shute Foundation for Nutritional Research of Anaheim, California. He advised both Mr. and Mrs. Neil that massive *200 doses of vitamins would alleviate their medical problems. He prescribed large doses of various vitamins including B-complex vitamins, calcium, protein vitamins, vitamins C, E, and other types of vitamins for Mrs. Neil and similar type vitamins for Mr. Neil as well as A/G Pro and Enzaid vitamins for Mr. Neil. Petitioners purchased and consumed these vitamins in accordance with Dr. Alsleben's prescriptions. During 1977, the total cost of the vitamins purchased and consumed by petitioners pursuant to Dr. Alsleben's prescriptions was $1,023. The total cost of the vitamins purchased and consumed by petitioners during 1978 under the instructions and prescriptions of Dr. Alsleben was $1,718. Sometime prior to January 1, 1977, Mr. Neil contacted representatives of the Universal Life Church, Inc., Modesto, California, with respect to obtaining a charter for a church and congregation and his credentials as a minister. Under date of January 1, 1977, Mr. Neil was sent a document headed at the top "Universal Life Church, Inc." and underneath that heading, "Charter." The document stated that "GARNETT W. NEIL ULC, INC., DEL MONTE CONGREGATION" of San Diego, California, had been granted *201 a charter by Universal Life Church, Inc., Modesto, California. He was also sent a document headed "Universal Life Church, Inc.," Modesto, California, "Credentials" which stated that "This is to certify that * * * GARNETT W. NEIL * * * has been ordained by Universal Life Church * * * [on] Jan. 1, 1977" and a document headed "Universal Life Church, Inc.," Modesto, California, "CONGREGATION" which stated that "This is to certify that a Congregation of the Universal Life Church, Inc. is started * * * [on] JANUARY 1, 1977 at 5019 DEL MONTE AVENUE * * * SAN DIEGO * * * CALIFORNIA." The address 5019 Del Monte Avenue was the residence of petitioners. Attached to the document sent to Mr. Neil by the Universal Life Church, Inc., Modesto, California, entitled "CHARTER" was a document entitled "Charter Agreement" which provided that the congregation at 5019 Del Monte Avenue, San Diego, California, "will report quarterly to International Headquarters." This document stated that the report would include, among other things, income, disbursements, and balance of the treasury of the church. On four different occasions during 1977, Mr. Neil gave cash to Mrs. Neil to *202 put in a safe in their home. Three of the amounts of cash were $5,000 each, and the other amount was $4,328. In 1978, on four different occasions, Mr. Neil gave Mrs. Neil cash to put in the safe in their home and the total of the cash given to Mrs. Neil in 1978 was $11,093. Mrs. Neil had the combination to this safe and she was the individual who could open the safe and take out the cash in it as she saw fit. Mr. Neil, in the quarterly reports he made to the Universal Life Church, Inc., would record the money he had given to Mrs. Neil to put in the safe as contributions to his congregation. At the time of the trial of this case, the cash Mrs. Neil had put into the safe was still in the safe and it was her intent, when her husband retired from the work he was doing during 1977 and 1978, that she and Mr. Neil would begin to use some of the money as salary for him to do full-time work as a minister and for enlarging their home or building a new home which they considered to be a church building. Mr. and Mrs. Neil bought their groceries and related items from a supermarket. They read an article which stated that where a can or package in a supermarket was marked with a "K" or a *203 "U," it meant that the item was acceptable as Kosher food. Mr. Neil was of the opinion that, when a can or box had a "K" or "U" on it, the price was greater than it would have been if the food were not approved by the Council of Rabbis as Kosher food. In buying the food, he had no intention to make a contribution to any religious organization but it was his view that in shopping at a supermarket he had no choice except to buy food which was higher priced because of having been approved as Kosher food. Petitioners, on their Federal income tax return for 1977, claimed a deduction of $1,150 for a replacement fence. On their Federal income tax return for the calendar year 1978, they claimed a deduction of $1,027 as fence replacement. Petitioners on their 1977 Federal income tax return claimed total medical expenses of $4,189 which they reduced by $1,160 as 3 percent of their adjusted gross income leaving an amount of $3,029 to which they added $150 of hospital insurance premiums making a total of $3,179 that they claimed as deductible. On their 1978 Federal income tax return, petitioners claimed total medical expenses of $2,406 which they reduced by $677 or 3 percent of their adjusted *204 gross income leaving $1,729 to which they added $150 as hospital insurance premiums making a total claimed deduction of $1,879. Petitioners on their 1977 Federal income tax return claimed a charitable contribution deduction of $19,328 to the Universal Life Church, Inc., and on their 1978 return claimed a deduction of $11,093 as a contribution to the Universal Life Church, Inc. These amounts represented the amounts of cash which Mr. Neil had given Mrs. Neil to put in the safe in their home. Petitioners on their 1978 Federal income tax return claimed a deduction for $200 under the designation "Kosher Food Tax." Respondent in his notice of deficiency to petitioners determined that the fence replacement which petitioners made on rental property was a capital improvement and that no deduction was allowable for the fence replacement in 1977, and in 1978 only a $73 depreciation deduction was allowable. The $73 amount was arrived at by using a 30-year useful life for the fence. Respondent in his notice of deficiency to petitioners for the year 1977 determined that petitioners had verified $3,222 of medical expenses rather than $4,189. Respondent redetermined the medical expense deduction *205 to which petitioners were entitled in 1977 by computing 3 percent of corrected adjusted gross income which was subtracted from $3,222. The item considered unverified by respondent in recomputing petitioners' medical expenses for 1977 was the $1,023 paid by petitioners for vitamins. [3] Respondent determined that petitioners' medical expenses for the year 1978 should be disallowed to the extent of $1,699 which included unsubstantiated medical expenses and "disallowance of vitamins." Respondent in the year 1977 disallowed petitioners' claimed charitable contribution to the Universal Life Church, Inc., of $19,328 and for the year 1978 disallowed petitioners' claimed contribution to the Universal Life Church, Inc., of $11,093. *206 Respondent in his notice of deficiency to petitioners for the year 1978 also disallowed the $200 claimed by petitioners to be deductible as "Kosher Food Tax." OPINION Section 263 provides generally that no deduction shall be allowed for any amount paid out for permanent improvements or betterments made to increase the value of the property. [4]
Clearly the fence placed by petitioners on their rental property was an improvement or betterment made to increase the value of the property. For this reason, respondent properly disallowed the deductions claimed by petitioners for the amounts expended in the building of the fence in 1977 and 1978. However, both parties agree that the fence was completed in January 1978 and that for the year 1978 petitioners are entitled to deduct depreciation on the fence *207 based on its useful life. The total cost of the fence is not in issue. Respondent offered the testimony of the revenue agent who determined a 30-year useful life for the fence. This agent testified that he never saw the fence. In his opinion, a 30-year useful life was too long and normally he would have used a 20-year useful life for this type of fence. He stated that he had asked Mr. Neil about the fence and Mr. Neil had said he had built it so well it should last forever and that he replied that he could not depreciate it on a basis of forever and Mr. Neil said that maybe the fence would last 30 years. Mr. Neil testified that he did not deny that he may have said to the revenue agent that the fence would last forever or for 30 years but that he was not thinking in terms of its being useful for the purpose for which he placed it on the property when he made the statement. Mr. Neil stated that he was an engineer and that in his opinion, considering the breakage caused by even small earthquakes in concrete block fences and the need for the fence to remain unbroken and uncracked to serve its purpose, the fence would have a useful life for the purpose for which it was installed of *208 approximately 15 years. The record is certainly not as clear as it might be as to the economic useful life of the concrete block fence. However, considering the length of time the wooden fence remained in good condition, the age of the house on the property on which the fence was placed, and Mr. Neil's testimony as to his opinion of the useful life of the fence as well as the agent's testimony that in his opinion a 30-year useful life was too long, we have concluded that the preponderance of the evidence here is that the useful life of the fence is 15 years. Therefore, depreciation to be deducted by petitioners in the year 1978 should be based on the total cost of the fence and a useful life of the fence of 15 years. The record is not completely clear with respect to respondent's reason for disallowing the deduction claimed by petitioners as a part of medical expenses for vitamins that they purchased pursuant to the direction of their doctor. Respondent in a memorandum filed with the Court points out that Rev. Rul. 55-261, 1955-1 C.B. 307, 312, states that-- if the prescribed *209 food or beverage is taken solely for the alleviation or treatment of an illness, is in no way a part of the nutritional needs of the patient, and a statement as to the particular facts and to the food or beverage prescribed is submitted by a physician, the cost of such food or beverage may be deducted as a medical expense. * * * The particular circumstance being considered in Rev. Rul. 55-261 was whiskey prescribed by a physician for the relief of angina pain and the cost of special food prescribed by a physician for a taxpayer who is on an ulcer diet. The record here shows that petitioners' doctor prescribed the vitamins they took for Mr. Neil's heart condition and Mrs. Neil's arterial sclerosis. Although the testimony on the subject is not stated in precise words, the indication from the record is that the vitamins were not a substitute for food or beverage which would normally be consumed by a person to satisfy his nutritional requirements. Respondent pointed out that the doctor who prescribed the vitamins for Mr. and Mrs. Neil was interested in nutritional research and that some of the same vitamins were prescribed for both Mr. and Mrs. Neil. In effect, respondent *210 is suggesting that perhaps the doctor's advice to Mr. and Mrs. Neil was not professionally sound. Mr. Neil was firm in his belief that the vitamins prescribed for him by Dr. Alsleben had proved to be helpful to his heart condition and that the vitamins prescribed for Mrs. Neil had been helpful to her arterial sclerosis. Considering the evidence as a whole, we conclude that the cost of the vitamins purchased by petitioners pursuant to the prescriptions of Dr. Alsleben in each of the years here in issue is properly to be included in the medical expenses of petitioners in determining the amount of medical expense deduction to which petitioners are entitled. [5] Here, an M.D. prescribed the vitamins for petitioners as a cure, mitigation, or prevention of disease and therefore these vitamins fall within the definition of medical expenses. See Randolph v. Commissioner,67 T.C. 481 (1976). *211 Section 170(c) provides that the term "charitable contribution" means a contribution of gift to or for the use of a corporation or foundation created or organized exclusively for religious, charitable, scientific, literary, or educational purposes no part of the net earnings of which inures to the benefit of any private shareholder or individual. [6]
*212 Since petitioners are claiming a charitable deduction, the burden is on them to show that they made contributions which meet the standards specified in section 170(c). Petitioners have totally failed to show that the amounts they put in their safe met the requirements of section 170(c) for a charitable deduction. Petitioners, claiming their First Amendment rights, refused to testify with respect to any aspect of their so-called church or congregation. Because of this refusal, they have totally failed to meet the requirement that they show that a contribution was made to an organization operated exclusively for religious or charitable purposes. Further, it is clear that petitioners actually made no contribution to any organization of the funds put in the safe by Mrs. Neil during the years 1977 and 1978. The most that has been shown is that at some juncture or some time in the future they intended to use this cash to make a contribution. However, in attempting to prove this fact, petitioners showed that in the future when the money was to be used they expected it to be used to pay Mr. Neil's salary and perhaps to make improvements to petitioners' home. Both of these uses would *213 be for the benefit of petitioners. It is so clear here that petitioners never in the years here in issue placed any funds beyond their control into the control of any organization, we do not deem it necessary to go into further detail in stating that petitioners have totally failed to carry their burden of proof that they made any contributions to the Universal Life Church, Inc., which are properly deductible in the years here in issue. See Oakknoll v. Commissioner,69 T.C. 770 (1978). In this case, when petitioners refused to answer any questions asked them by respondent's counsel as to the nature of the activities of their church and its membership claiming their First Amendment rights, the Court informed them that it was necessary for them to establish that any funds they had contributed were to an organization operated exclusively for charitable and religious purposes. The Court further informed them that although the First Amendment protected their religious freedom, this protection did not extend to allowing them to take a charitable deduction with no explanation of the nature of the organization to which the contribution was made.On their return, they claimed *214 a contribution was made to the Universal Life Church, Inc. However, from the testimony, it was obvious that no funds were given by petitioners to the Universal Life Church, Inc., Modesto, California, and that petitioners' only contention was that the funds were given to the church "chartered" by Mr. Neil as the "Del Monte Congregation." The record is devoid of any evidence about the "Del Monte Congregation" except that the only members were Mr. and Mrs. Neil and their son and that Mrs. Neil referred to the home where she and Mr. Neil lived as the "church building." Petitioners refused to answer any other question about the organization. As was pointed out in United States v. Holmes,614 F.2d 985, 989-990 (5th Cir. 1980)-- Plaintiff is free to espouse his religious doctrine and to solicit support for his cause. He simply must allow the government access to information in order to determine whether the church remains within the criteria for a lighter tax burden. The church may, of course, forego the exemption and limit IRS access to church records. [Fn. ref. omitted.] Petitioners in this case refused to furnish any information about their church activities *215 to respondent or to the Court. We conclude that petitioners have totally failed to establish that they are entitled to the deductions of $19,328 in 1977 and $11,093 in 1978 which they claimed as contributions to the Universal Life Church, Inc.
The record is totally devoid of any evidence to substantiate petitioners' claimed deduction of $200 for "Kosher Food Tax" either as a tax or as a charitable contribution. Petitioners totally failed to show that any food they bought was "Kosher" food and, if it were, that it cost any more than any other food would have cost. What the record shows is that petitioners read some article that stated that certain foods marked in a certain manner were Kosher foods and for this reason cost more than other foods because they had been approved by the Council of Rabbis. Petitioners did not know whether or not this article was accurate. No evidence was received that any foods purchased by petitioners were Kosher foods since petitioners had no competent evidence of this fact to offer. We therefore sustain respondent in his disallowance of the $200 deduction claimed by petitioners as "Kosher Food Tax" because of petitioners' total failure of proof. *216 When respondent determines an addition to tax under section 6653(a), the burden is on the taxpayer to show that no part of the deficiency was due to their negligence. Enoch v. Commissioner,57 T.C. 781, 802 (1972), and cases there cited. Petitioners offered no satisfactory evidence to explain the reasons for a number of the errors in their returns. Because of petitioners' failure of proof, we sustain respondent's determination of the additions to tax under section 6653(a). Decision will be entered under Rule 155.
Footnotes
1. Petitioners' tax liability for the year 1979 was disposed of entirely by agreement of the parties.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. Obviously the $1,023 plus the $3,222 considered as verified does not total $4,189. The addition is not correct if the $150 of claimed hospital insurance premiums is added into the amount. However, the parties at the trial agreed that the amount which was stated in the notice of deficiency not to be verified as paid for qualifying medical expenses consisted of the amounts petitioners paid for vitamins and that the amount they paid in 1977 was $1,023.↩
4. Sec. 263(a) provides in part as follows: SEC. 263. CAPITAL EXPENDITURES. (a) General Rule.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *↩
5. In Hammons v. Commissioner, a Memorandum Opinion of this Court entered Nov. 24, 1953, we held that an amount paid by a taxpayer for vitamins was properly a part of deductible medical expenses. In Sampson v. Commissioner,T.C. Memo. 1970-212, we stated: After carefully evaluating his testimony, we remain unconvinced that petitioners expended any amounts for medical expenses and charitable contributions other than $173.04 for doctors, hospital service, and the like and possibly $60.00 for vitamins. n2 Neither of these amounts is sufficient to entitle petitioners to any deduction. Footnote 2 stated: We express no opinion as to whether vitamins purchased without a doctor's prescription constitute medical expenses. Cf. Marshall J. Hammons [Dec. 19, 998(M)], a Memorandum Opinion of this Court dated Nov. 24, 1953; Rev. Rul. 55-261, 1955-1 C.B. 307. Cf. Lingham v. Commissioner,T.C. Memo. 1977-152, in which we stated: Petitioner claimed sizeable medical deductions for vitamins and food. She prescribes the dosages of vitamins for herself and claims to limit her diet to organic foods. Vitamins consumed pursuant to a self-imposed plan are not deductible as medical costs. * * *↩
6. Sec. 170(c) provides in part as follows: (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- (2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereor, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provisions of athletic facilities or equipment), or for the prevention or cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).↩