T.C. Summary Opinion 2017-23

UNITED STATES TAX COURT

WILLIAM A. ALEXANDER, JR. AND DIANE C. ALEXANDER, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23493-15S.               Filed April 10, 2017.

William A. Alexander, Jr., and Diane C. Alexander, pro sese.

<u>Michael T. Garrett</u> and <u>Matthew A. Houtsma</u>, for respondent.

SUMMARY OPINION

JACOBS, <u>Judge</u>:  This case was heard pursuant to the provisions of section
7463 of the Internal Revenue Code in effect when the petition was filed.  Pursuant
to section 7463(b), the decision to be entered is not reviewable by any other court,
and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency in petitioners' Federal income tax of $11,831 and an accuracy-related penalty under section 6662(a) of $2,366 for 2012. The deficiency is the result of respondent's determinating that petitioners received $18,000 in unreported nonemployee compensation and $40,956 in unreported Social Security disability benefits and making corresponding computational adjustments. At trial respondent conceded that petitioners received $15,800, rather than $18,000, in unreported nonemployee compensation.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The parties filed a stipulation of facts and accompanying exhibits that are incorporated by this reference. When they timely filed their petition, petitioners, husband and wife, resided in Colorado.

Mr. Alexander is a former attorney who practiced law in the fields of workers' compensation and Social Security disability matters for approximately 35 years. He considers himself an expert in these fields. In 2011 Mr. Alexander ceased practicing law because (1) he was suffering from serious medical problems

and (2) the State of Colorado had suspended him from the practice of law. On May 8, 2012, Mr. Alexander was permanently disbarred from the practice of law.

Mrs. Alexander is a registered nurse. In 2012 she worked at the cardiac unit of a local hospital and taught nursing students. She used her nursing background to treat Mr. Alexander's medical problems.

By 2012 Mr. Alexander's health had improved to the point he was able to work for Steven Mullens, another workers' compensation attorney. Messrs. Alexander and Mullens were well known to each other in the workers' compensation community. Indeed, after Mr. Alexander ceased practicing law, most of his former clients were referred to Mr. Mullens' firm.

Mr. Mullens was involved in a Federal class action lawsuit against Wal-Mart and Concentra Health on behalf of all injured Colorado residents that had worked for Wal-Mart. Mr. Mullens asked Mr. Alexander to assist him in the litigation even though Mr. Mullens was aware that Mr. Alexander had been disbarred. Mr. Alexander agreed to help Mr. Mullens and asked to be paid $100 per week for gas and meals expenses while working on the case. Mr. Mullens agreed to Mr. Alexander's request.

Mr. Alexander reviewed materials and documents in 30 boxes of Wal-Mart's claims adjusters' files. Each box was three feet long and one foot wide.

Mr. Alexander prepared written summaries of each file in an attempt to document Mr. Mullens' and his beliefs that insurance adjusters working for Wal-Mart had often dictated the medical care to be provided by Concentra doctors to the injured workers. Mr. Alexander worked at Mr. Mullens' office approximately four hours a day, four or five days per week, for eight weeks. Mr. Alexander estimated he worked 160 hours on the Wal-Mart litigation. Mr. Mullens requested Mr. Alexander to submit a bill for the hours he worked on the case. On the eve of trial the lawsuit was settled.

After completing his Wal-Mart work, Mr. Alexander did "private work" for Mr. Mullens. Mr. Alexander's work consisted of performing legal research, drafting briefs and responses, and preparing memoranda for Mr. Mullens during the latter part of 2012. It was agreed that Mr. Mullens would pay Mr. Alexander according to the value of the case and the percentage of Mr. Alexander's contribution. Mr. Alexander worked between 50 and 100 hours on Mr. Mullens' "private work" in 2012.

In addition to paying Mr. Alexander $800 in reimbursements ($100 a week for eight weeks), Mr. Mullens made two payments to Mr. Alexander: (1) a $5,000 check, on an unspecified date in 2012, which Mr. Alexander at one time characterized as a loan that was ultimately forgiven and at another time as an

advance for his "private work" and (2) a $10,000 check dated April 18, 2012. The $10,000 check was endorsed by both petitioners with the notation "Pay to Diane C. Alexander" and deposited into petitioners' joint bank account.

Mr. Mullens' office issued a Form 1099-MISC, Miscellaneous Income, to Mr. Alexander for nonemployee compensation totaling $18,000. Respondent concedes that Mr. Alexander received $15,800 rather than $18,000 from Mr. Mullens during 2012. Petitioners claim that they did not receive a Form 1099-MISC from Mr. Mullens.

Mr. Alexander believed that Mr. Mullens had paid him less than he was worth as an experienced workers' compensation attorney, stating: "If he had told me that he was paying me this amount of money [i.e., the $15,800] I would have walked out of the office." Mr. Alexander asserts that the payments he received from Mr. Mullens were merely gifts.

When Mr. Alexander learned that Mr. Mullens had received more than $1 million in legal fees for the Wal-Mart litigation, Mr. Alexander confronted him, demanding more money. Mr. Alexander testified that in a "hysterical" telephone conversation, Mr. Mullens told Mr. Alexander: "'I don't owe you a goddamn thing.' And, you know, 'I chose to give you $15,000 and that's all I'm going to give you.' And those were his exact words, 'give you.'" Mr. Alexander followed

up the phone call with a letter to Mr. Mullens stating that Mr. Mullens owed him "a reasonable wage." And when Mr. Mullens' office mailed the Form 1099-MISC to an out-of-date address, Mr. Alexander believed that the mistake was made deliberately "just to be difficult, probably in the hopes I wouldn't get it, because he knew I would be in his office in a minute if I got a 1099 saying that he had paid me that money." At this point, we note that Mr. Mullens died before trial and therefore was not available to testify as to his intent (gift or compensation) in making the payments to Mr. Alexander.

Although he was working for Mr. Mullens, Mr. Alexander received $40,956 in Social Security disability benefits in 2012. The disability checks were deposited into petitioners' joint bank account. The Social Security Administration issued a Form 1099-G, Certain Government Payments, documenting these disability benefit payments, although petitioners do not remember receiving this form.

Mrs. Alexander handled the family's finances. She opened the family's mail, balanced the family's checking account, and paid the bills. She was well aware of the family's finances and knew that the checks from Social Security, as well as the checks from Mr. Mullens, were deposited in the family's checking account.

Petitioners filed a joint 2012 Form 1040, U.S. Individual Income Tax Return, prepared by Roy Kirmer, a certified public accountant and petitioners' longtime tax return preparer. Mrs. Alexander took the lead in working with Mr. Kirmer to prepare petitioners' tax return, meeting with him and providing him with documents and necessary records. Petitioners did not disclose either the Social Security disability payments or Mr. Mullens' payments to Mr. Kirmer; thus, petitioners' Form 1040 reported only Mrs. Alexander's wages of $57,200. In a conversation Mr. Kirmer had with petitioners in 2014, Mr. Kirmer first learned that petitioners had received some kind of disability payments. Since Mr. Kirmer had no specific information about the payments, he told petitioners that the payments probably were not taxable. But when Mr. Kirmer later learned that the payments were Social Security benefits, and therefore taxable, he told petitioners: "[T]hey [the IRS] will pick that up in the matching program, and you're going to be taxed, and you just need to pay it. And we are not going to prepare an amended return." At trial Mr. Kirmer stated that if petitioners had informed him of the Social Security disability payments, he "absolutely" would have reported the amounts of the payments on the tax return.

## Discussion

In an unreported income case, such as the instant matter, a presumption of correctness attaches to the Commissioner's determination after he provides a minimal evidentiary foundation. See Rule 142(a); United States v. McMullin, 948 F.2d 1188, 1192 (10th Cir. 1991). However, we do not decide this case by reference to the placement of the burden of proof.[1]

I.      Mr. Mullens' Payments to Mr. Alexander

Section 61(a)(1) provides that compensation for services is included in gross income for Federal income tax purposes. The parties agree that Mr. Alexander was paid $15,800 in 2012 for performing work for Mr. Mullens. Respondent determined that these payments were taxable nonemployee compensation. Petitioners, in contrast, claim these payments were gifts and thus nontaxable pursuant to section 102(a).

Section 102 provides that gross income does not include amounts acquired by gift. Whether a payment is a gift under section 102(a) or gross income under section 61(a) is a factual question. See Banks v. Commissioner, T.C. Memo.

---

[1]In certain circumstances the burden of proof with respect to factual matters may shift to the Commissioner. Sec. 7491(a). Petitioners do not argue that sec. 7491(a) applies herein, nor do they show that they met its requirements for shifting the burden of proof.

1991-641. The Supreme Court has held that distinguishing a gift from taxable income "does not lend itself to any more definitive statement that would produce a talisman for the solution of concrete cases." Commissioner v. Duberstein, 363 U.S. 278, 284-285 (1960). The Supreme Court concluded that the transferor's intent is the most critical consideration and there must be an objective inquiry into the transferor's intent. Id. at 285-286. Generally, the transfer must be made from a "'detached and disinterested generosity' * * * 'out of affection, respect, admiration, charity, or like impulses.'" Id. at 285 (citations omitted). We must make "an objective inquiry as to whether what is called a gift amounts to it in reality. * * * It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." Id. at 286 (citations omitted). In applying these principles to the facts of the case, we find that Mr. Alexander received taxable nonemployee compensation from Mr. Mullens.

Mr. Mullens died before trial; hence, we cannot know for certain his intent in making the payments to Mr. Alexander. However, the objective facts demonstrate that Mr. Alexander: (1) was paid after he performed work for Mr. Mullens; (2) submitted a timesheet showing the number of hours he worked, so that Mr. Mullens could submit the timesheets to the trial court "as a cost and get

me paid."; (3) expected to be paid for his work on Mr. Mullens' "private work" according to the value of the cases he worked on and his contribution towards their success; (4) characterized the $5,000 payment first as a loan that was forgiven, which would not be a gift, see sec. 61(a)(12) (discharge of indebtedness constitutes gross income),[2] and then as an advance paid in anticipation of work he was to perform, which would also not be a gift; and (5) considered himself to be underpaid and confronted Mr. Mullens both on the telephone and by letter demanding a reasonable wage. The totality of these objective facts convinces us that Mr. Mullens did not intend the payments he made to Mr. Alexander to be gifts made from a detached and disinterested generosity.

Petitioners assert that because the notice of deficiency was incorrect in that respondent had determined that Mr. Alexander was paid $18,000, rather than $15,800, the burden of proof shifted to respondent to prove petitioners' correct taxable income. Petitioners' assertion is not sustainable. As we noted supra page 8, this case does not turn on the burden of proof. Respondent concedes that his $18,000 determination is erroneous, and petitioners concede that Mr. Alexander

---

[2]Sec. 108(a) excludes the discharge of indebtedness from gross income if the debt was discharged under five specific circumstances. Petitioners have not argued, or provided evidence to demonstrate, that they meet the requirements of any of the exceptional circumstances.

received $15,800 from Mr. Mullens. The question we must decide is the characterization of the $15,800; is it a nontaxable gift or is it taxable income? Respondent's concession as to the amount Mr. Alexander received from Mr. Mullens does not affect its characterization.

Next, petitioners argue that the moneys that Mr. Alexander received could not be compensation because the amount was insufficient to induce him to work for Mr. Mullens. Mr. Alexander maintains that the motivation for rendering his services was "for the duty that he felt that he owed to the community of injured workers that have given him an acceptable lifestyle for more than 30 years." Mr. Alexander's motives are not in question, but we are mindful that when he performed his work for Mr. Mullens, he was a disbarred attorney and Mr. Mullens knew this. Mr. Alexander was paid $15,000 for 210 to 260 hours[3] of work, which amounted to $58 to $71 per hour. We do not believe this to be an unreasonably low rate of pay for a disbarred attorney. The $800 expense reimbursement that Mr. Alexander received is also includible in his income. See Commissioner v. Kowalski, 434 U.S. 77 (1977) (cash meal allowance is taxable income); Goldstein v. Commissioner, 73 T.C. 164 (1979) (stipends are taxable income).

---

[3]These hours are the sum of 160 hours working on the Wal-Mart case and 50 to 100 hours working on Mr. Mullens' "private work".

Mr. Alexander also asserts that if he were an injured worker in a workers' compensation case, the judge would not consider him to be an employee eligible to receive workers' compensation benefits. Petitioners have not cited any specific statute or case to support this bold assertion. Rather they refer to two unreported cases with no citations. Nor do petitioners attempt to establish that the standard for determining employment under Colorado's workers' compensation laws is similar to the rules set forth in the Code.

In sum, we find that the $15,800 that Mr. Mullens paid to Mr. Alexander is includible in petitioners' 2012 income.

## II.      Mr. Alexander's Social Security Disability Payments

Section 86 requires the inclusion in gross income of up to 85% of Social Security benefits, including disability benefits, received during the taxable year. See sec. 86(a), (d);[4] see also Reimels v. Commissioner, 123 T.C. 245, 247 (2004), aff'd, 436 F.3d 344 (2d Cir. 2006); Watts v. Commissioner, T.C. Memo. 2009-103. Petitioners concede that Mr. Alexander received $40,956 in Social Security disability benefits, and they do not dispute respondent's determination that, because of petitioners' other income, 85% of Mr. Alexander's Social Security

---

[4]Sec. 86(d)(1)(A) defines Social Security benefits to include amounts received under tit. II of the Social Security Act, 42 U.S.C. secs. 401-434 (2000), as amended, which include Social Security disability benefits. Id. sec. 423.

benefits is taxable. <u>See</u> sec. 86(a)(2)(B). Thus, petitioners concede that $34,813 of Mr. Alexander's Social Security disability benefits constitutes taxable income and that they owe tax as respondent determined.

Petitioners claim that if the Court were to find that the payments that Mr. Alexander received constituted taxable income, which we have found, Mr. Alexander would be obligated to repay the Social Security Administration the amounts he received. Consequently, petitioners seek an equitable adjustment to Mr. Alexander's taxable Social Security disability payments. In this respect, petitioners argue:

> This Court may state that it is not a Court of Equity. The undersigned takes offense at such a holding. This Court does equity on a routine basis. The Innocent Spouse Doctrine is regularly determined by This Court. That doctrine is no less equitable than the ruling requested herein.
>
> The amount paid to W. Alexander by the SSA [Social Security Administration] is not disputed. In fact, Petitioners admit that they owe taxes on that amount. The only reason that those taxes have not all ready been paid is that any amount paid by Mullens as taxable income should be deducted from those payments. Even though the government would like a double payment, it cannot be expected. If the payments received from Mullens were taxable, then W. Alexander should not have received that amount from SSDI.

Despite petitioners' conviction, this Court is not a court of equity. <u>See</u> <u>Commissioner v. McCoy</u>, 484 U.S. 3, 7 (1987); <u>Paxman v. Commissioner</u>, 50 T.C.

567, 576 (1968), aff'd, 414 F.2d 265 (10th Cir. 1969). Our decisions in innocent spouse cases are governed by statute, not by equitable doctrines. See sec. 6015. And we are mindful that the Code provides for Social Security benefits to be adjusted for repayments during the tax year. Section 86(d)(2)(A) provides:

> For purposes of this section, the amount of social security benefits received during any taxable year shall be reduced by any repayment made by the taxpayer during the taxable year of a social security benefit previously received by the taxpayer (whether or not such benefit was received during the taxable year).

Section 86(d)(1) defines the term "Social Security benefit" as "any amount received by the taxpayer by reason of entitlement to--(A) a monthly benefit under title II of the Social Security Act, or (B) a tier 1 railroad retirement benefit." Thus, section 86(d)(2)(A) allows a taxpayer to reduce the amount of Social Security benefits includible in income if the taxpayer repays the Social Security benefits received during the same tax year. Petitioners, however, have not done so.

We therefore find that 85% of Mr. Alexander's Social Security disability payments is includible in petitioners' 2012 income as provided by section 86.

III. <u>Section 6662(a) Accuracy-Related Penalty</u>

Respondent determined that petitioners are liable for a section 6662(a) accuracy-related penalty of $2,366 for 2012. Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to, inter

alia, negligence or disregard of rules or regulations, subsec. (b)(1), or a substantial understatement of income tax, subsec. (b)(2).

Negligence as used in section 6662(b)(1) is defined as any failure to make a reasonable attempt to comply with the Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec 1.6662-3(b)(1), Income Tax Regs. An understatement of income tax is substantial for purposes of section 6662(b)(2) if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the section 6662(a) accuracy-related penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner has met his burden of production, the taxpayers bear the burden of proving that the penalty is inappropriate, by demonstrating for example, that their position was supported by substantial authority under section 6662(d)(2)(B)(i) or that they had reasonable cause for the underpayment and acted in good faith under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. Reasonable cause and good faith are determined on a case-by-

case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent has met his burden of production with respect to petitioners' substantial understatement of income tax. Petitioners reported taxable income of $57,200 on their 2012 tax return. Respondent has established that petitioners' income was $107,813 for 2012 (i.e., the sum of $57,200 in reported wages, plus $34,813 as the taxable portion of Mr. Alexander's Social Security disability benefits, plus Mr. Alexander's compensation from Mr. Mullens of $15,800). Thus, petitioners reported approximately 53% of their total 2012 income.

Petitioners do not assert that there is substantial authority supporting their position. Rather, they argue that they had reasonable cause and acted in good faith in taking their position. In this regard, they claim that: (1) they relied on Mr. Kirmer in filing their 2012 tax return and (2) they could not provide Mr. Kirmer with all of their tax information because they did not timely receive Forms 1099 from the Social Security Administration and Mr. Mullens.

Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011

(5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs.

We have defined "reasonable" as follows:

> In sum, for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners meet the first prong of the Neonatology Assocs., P.A. test; Mr. Kirmer is a competent and experienced tax adviser.  However, petitioners do not meet either the second prong of the test in that they did not provide necessary and accurate information to Mr. Kirmer or the third prong of the test in that they did not rely on Mr. Kirmer's advice.

With respect to the second prong of the Neonatology Assocs., P.A. test, petitioners acknowledge that they did not provide Mr. Kirmer with full information.  However, they argue that they should be excused for this failure because they did not timely receive the Forms 1099.  Petitioners' position is

unreasonable as they were in possession of all the information necessary to properly report their income.

With respect to Mr. Alexander's Social Security disability benefits, because he was a former attorney who had practiced in the field of Social Security disability benefits for 35 years, it is unreasonable to believe he needed a Form 1099-G to know that the benefits were taxable. Moreover, the $40,956 in benefits Mr. Alexander received throughout the year was a significant portion of petitioners' income for 2012. It was not something that could be forgotten. Mrs. Alexander was also aware, or should have been aware, that petitioners had received Social Security disability benefits. She had full access to petitioners' joint bank account, and at trial she answered when asked whether she was aware of the Social Security benefit deposits: "I probably could have [known] if I paid attention."

With respect to the payments received from Mr. Mullens, petitioners were well aware that Mr. Alexander had received $15,800 from him, yet they never disclosed this fact to Mr. Kirmer. And Mr. Alexander's two "confrontations" with Mr. Mullens, wherein he demanded additional money on the basis of the benefits of his work, make it clear that Mr. Alexander did not consider Mr. Mullens' payments to be a gift when he received them. Mr. Alexander stated that he was

not a tax lawyer, yet he did not seek Mr. Kirmer's expert opinion as to the taxation of the payments he received from Mr. Mullens. We previously noted that Mrs. Alexander was aware of the payments. She had access to petitioners' joint bank account, and she endorsed Mr. Mullens' $10,000 check with the notation "Pay to Diane C. Alexander".

We have held that "[t]he ultimate responsibility for a correct return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return." Enoch v. Commissioner, 57 T.C. 781 (1972). And we have held that the fact that a taxpayer did not timely receive information returns does not allow the taxpayer to claim the reasonable cause defense. See Brunsman v. Commissioner, T.C. Memo. 2003-291 (rejecting the reasonable cause defense where the taxpayer received only one Form 1099-MISC but knew he had held two jobs); Du Poux v. Commissioner, T.C. Memo. 1994-448 ("[F]ailure to receive tax documents [such as Form 1099-MISC] does not excuse taxpayers from the duty to report income.").

Petitioners also fail to meet the third prong of the Neonatology Assocs., P.A. test. Not only did they not seek Mr. Kirmer's advice regarding the unreported income; at trial Mr. Kirmer stated that had petitioners informed him of

the Social Security disability benefits, he would have reported the amount on the tax return.

In conclusion, we hold that petitioners failed to show that they had reasonable cause for, or acted in good faith with respect to, the underpayments.

To reflect the foregoing and concessions by respondent,

<u>Decision will be entered under</u>

<u>Rule 155</u>.